## COMMONWEALTH OF MASSACHUSETTS

DUKES COUNTY, SS.                    EDGARTOWN DISTRICT COURT

|  |  |
|---|---|
| ROBERT A. DOANE, | ) |
| Plaintiff, | ) CIVIL #: 1935CV0016 |
| v. | ) |
| XANADU MARKETING, INC., | ) **FIRST AMENDED** |
| d.b.a., "Lending Cloud 365," | ) **COMPLAINT** |
| MOTOR TREND GROUP, LLC., | ) |
| JOHN and/or JANE DOE(s); and/or | ) |
| XYZ Company(ies), | ) |
| Defendants. | ) |

### INTRODUCTION

As was forcefully stated by Senator Hollings, the sponsor of the Federal Telephone Consumer Protection Act ("TCPA"), "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30,821–30,822 (1991). Nearly 30 years later, the Federal Trade Commission's "Biennial Report to Congress" reveals a surge in complaints about robocalls in 2017, with 4.5 million complaints filed in 2017 compared to 3.4 million in 2016.[1] Unsolicited text messages containing marketing, which are considered calls within the meaning of the TCPA, are nearly always accomplished through automated means, and are likewise disruptive and offensive to those who receive them.

Robert Doane ("Doane" or "Plaintiff"), is listed on federal and the Massachusetts do-not-call registries. Doane is the primary caretaker and power of attorney for his elderly parents and stepmother with dementia. Doane has several other responsibilities requiring his focus and

---

[1] https://www.ftc.gov/system/files/documents/reports/biennial-report-congress-under-do-not-call-registryfee-extension-act-2007-operation-national-do-not/biennial_do_not_call_report_fy_2016-2017_0.pdf

attention. Doane also has a medical condition causing chronic pain and a sleep disorder, often requiring sleep during the day. Doane does not want to be bothered by harassing telephone solicitations (or unsolicited text messages), when he has clearly expressed to the world he does not want to be bothered by same, especially since these cause him, in his circumstances, substantial disruption and result in harms of significant consequence. Doane, as a result of exercising his rights for redress after being harassed by telemarketers before, has earned a place on what the telemarketing industry refers to as the "litigators list," a list which telemarketers often subscribe to ensure they do not stumble on someone who will take action for their illegal conduct – as though being registered on federal and state do-not-call registries is somehow not enough. Yet, Xanadu Marketing, Inc. ("Xanadu"), and Motor Trend Group LLC ("MotorTrend") (collectively the Defendants), caused their telemarketers to repeatedly call and then text Doane attempting to sell him vehicles and related products and services. After finally identifying MotorTrend from a text message, Doane sent MotorTrend a demand letter demanding the text messages stop. The text messages continued. Doane then sent a notice of intent to sue. The text messages still continued. MotorTrend then, in a belated response, named Xanadu as directly responsible, and provided Doane with Xanadu's contact information. Doane inquired with Xanadu who specifically claimed that on March 16, 2019, a person identified as "Edgar Vazquez" opted in to receive text messages using Doane's phone number, an admission which exposed another element to the Defendants' overall scheme – the prior unsolicited spoofed telemarketing calls attempting to sell Doane vehicle-related products and services, which apparently led to the illegal texts to Doane attempting to solicit business for MotorTrend. Specifically, months earlier, Doane, after being harassed by the aforementioned telemarketing calls, provided – for the sole purpose of attempting to identify those responsible  – a similar sounding alias to the illegal telemarketer, which the telemarketer apparently transcribed as "Edgar Vazquez." When Doane advised Xanadu's corporate counsel that in fact the text messages Doane was receiving relate to prior illegal telemarketing, counsel accused Doane of the crime of committing identity fraud and counsel alleged he was in the process of contacting the real Edgar Vazquez regarding Doane's criminal use of his name. Worse, Xanadu's corporate counsel later – using false pretenses – threatened to bring a defamation claim against Doane.  Clearly, Doane's successful exposure of Xanadu's unfair and deceptive conduct struck a nerve, and since it appears Xanadu's tactics are an attempt to dissuade Doane from doing anything about Xanadu's telemarketing practices, Doane will not acquiesce to Xanadu's threats.

Accordingly, Doane brings this action against Xanadu and MotorTrend seeking actual, statutory, and punitive damages for knowing and willful violations of the Telephone Consumer Protection Act, 47 U.S.C. §227, et seq. ("TCPA"), the Massachusetts Telephone Solicitation Act, G.L. c 159C, et seq. ("MTSA"), for invasion of privacy and intrusion upon seclusion, intentional infliction of emotional distress, with actual harms therefrom applied to the provisions of the Massachusetts Consumer Protection Act, G.L. c. 93A, et seq. ("MCPA"). Doane seeks from the Defendants: (i) sum-certain statutory damages of $500 for each violation of the TCPA, to be trebled for knowing and willful violations thereof; (ii) sum-certain statutory damages under the MTSA of not less than $5,000 for each violation thereof; (iii) actual damages as determined by the Court for invasion of privacy, intrusion upon seclusion, and intentional infliction of emotional distress, as applied to G.L. c. 93A, and the not less than doubling and up to trebling of same as punitive damages thereunder for the unfair and deceptive practices while in trade or commerce as to each of the Defendants.

## THE PARTIES

1.      Plaintiff, Robert A. Doane ("Doane" or "Plaintiff"), is an individual residing at 21 New Lane, West Tisbury, Massachusetts 01880, with an off-season mailing address of 103 Prospect Street, Wakefield Massachusetts, 01880, where he may presently be served.

2.      Defendant, Xanadu Marketing, Inc., d.b.a., "LendingCloud365" ("Xanadu") was at all time relevant a company organized under the laws of Michigan, with its registered office located at 3181 Prairie Street, Suite 104, Grandville, MI 49418. Xanadu's registered agent is Edward Winkler, 3181 Prairie Street, Suite 104, Grandville, MI 49418.

3.      Defendant, Motor Trend Group ("MotorTrend") was at all time relevant a company organized under the laws of Delaware, with a principle office located at 831 S. Douglas Street, El Segundo, CA 90245. MotorTrend's registered agent is CT Corporation System (C0168406).

4.      Other than those named, Plaintiff does not yet know the identity of what may be other employees/agents that had direct, personal participation in or personally authorized the conduct found to have violated the TCPA, the MTSA, and the MWTA, and were not merely tangentially involved. Upon discovery, such individual defendants may be added, as numerous District Courts have found that individual officers/principals of corporate entities may be personally

liable (jointly and severally) under the TCPA (and likely other statutes implicated) if they had direct, personal participation in or personally authorized the conduct found to have violated the statute, and were not merely tangentially involved. *Texas v. American Blastfax, Inc.*, 164 F.Supp.2d 892, 899 (W.D. Tex. 2001) ("American Blastfax"); *Sandusky Wellness Center, LLC v. Wagner Wellness, Inc.*, 2014 WL 1333472, at * 3 (N.D. Ohio March 28, 2014); *Maryland v. Universal Elections*, 787 F.Supp.2d 408, 415-16 (D.Md. 2011) ("Universal Elections"); *Baltimore-Washington Tel Co. v. Hot Leads Co.*, 584 F.Supp.2d 736, 745 (D.Md. 2008); *Covington & Burling v. Int'l Mktg. & Research, Inc.*, 2003 WL 21384825, at *6 (D.C.Super Apr. 17, 2003); *Chapman v. Wagener Equities, Inc.* 2014 WL 540250, at *16-17 (N.D.Ill. Feb. 11, 2014); *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 775 F.Supp.2d 1316, 1321 (D.Wy.2011) ("Versteeg").

5.     Whenever in this complaint it is alleged that Defendants committed any act or omission, it is meant that those Defendants officers, directors, vice-principals, agents, servants, or employees, subsidiaries, or affiliates committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of the Defendants or was done in the routine normal course and scope of employment of Defendants officers, directors, vice-principals, agents, servants, or employees.

6.     Defendant, John Doe(s) and Jane Doe(s) ("Jane Doe(s) and/or John Doe(s)") are unknown individuals residing at an unknown address. Upon discovering their true identities this complaint will be amended to reflect same.

7.     Defendant, XYZ Company(ies), is an unknown company(ies). Upon discovering true identity(ies) this complaint will be amended to reflect same.

## JURISDICTION AND VENUE

8.     The allegations of paragraphs 1 through 7 of this Complaint are realleged and incorporated by reference.

9.     This Court has subject matter jurisdiction because the likelihood of recovery (before multiplication) does not exceed $25,000, and with exception of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"), the claims herein arise under Massachusetts

law. As to the TCPA, this federal statute provides that "[a] person or entity may, if otherwise permitted by the laws or rules of court of a [s]tate, bring in an appropriate court of that [s]tate" an action to enforce the statute. This court therefore has subject matter jurisdiction of the claims arising under the TCPA.

10.     This Court also has separate personal jurisdiction over any out-of-state defendants for those claims arising under the Massachusetts Telemarketing Solicitation Act, G.L. c. 159C et seq., because "[a] court of the Commonwealth may exercise personal jurisdiction over a nonresident or his executor or administrator as to an action or proceeding authorized by [G.L. c. 159C § 12]."

11.     This Court has general personal jurisdiction , and specific personal jurisdiction over any out-of-state defendants under the Massachusetts Long Arm Statute, G.L c. 223A, because the defendants directly and through their agents: (a) transacted business in Massachusetts; and/or (b) contracted to supply services and things in Massachusetts; and/or (c) caused tortuous injury by acts and omissions in Massachusetts; and/or (d) caused tortuous injury in Massachusetts by acts and omissions outside Massachusetts in the course of regularly doing and soliciting business, and engaging in other persistent course of conduct while deriving substantial revenue from those goods used and consumed and services rendered in Massachusetts.

12.     Plaintiff is a resident of West Tisbury, County of Dukes County, Massachusetts, with an off-season residence in Wakefield, Massachusetts, and pursuant to G.L. c. 223, §2, because this is a transitory action, and Plaintiff's residence is within this judicial district, venue is proper.

## LEGAL BASIS FOR THE FEDERAL TELEMARKETING CLAIMS

13.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In doing so, Congress recognized that "[u]nrestricted telemarketing…can be an intrusive invasion of privacy…" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(5) (1991) (codified at 47 U.S.C. § 227).

14.     Specifically, the TCPA restricts telephone solicitations (i.e., telemarketing) and the use of automated telephone equipment. The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines. It also specifies several technical requirements for fax machines, autodialers, and voice messaging systems—principally

with provisions requiring identification and contact information of the entity using the device to be contained in the message.

15.     In its initial implementation of the TCPA rules, the FCC included an exemption to its consent requirement for prerecorded telemarketing calls. Where the caller could demonstrate an "established business relationship" with a customer, the TCPA permitted the caller to place pre-recorded telemarketing calls to residential lines. The new amendments to the TCPA, effective October 16, 2013, eliminated the established business relationship exemption. Therefore, all pre-recorded telemarketing calls to residential lines and wireless numbers violate the TCPA if the calling party does not first obtain express written consent from the called party.

16.     As of October 16, 2013, unless the recipient has given prior express written consent,[2] the TCPA and FCC regulations promulgated pursuant to the TCPA mandate the follow:

(i)       Prohibits solicitors from calling residences before 8 a.m. or after 9 p.m., local time.

(ii)      Requires solicitors provide their name, the name of the person or entity on whose behalf     the call is being made, and a telephone number or address at which that person or entity may be contacted.

(iii)     Prohibits solicitations to residences that use an artificial voice or a recording.

(iv)      Prohibits any call or text made using automated telephone equipment or an artificial or prerecorded voice to a wireless device or telephone.

(v)       Prohibits any call made using automated telephone equipment or an artificial or prerecorded voice to an emergency line (e.g., "911"), a hospital emergency number, a physician's office, a hospital/health care facility/elderly room, a telephone, or any service for which the recipient is charged for the call.

(vi)      Prohibits autodialed calls that engage two or more lines of a multi-line business.

---

[2] Prior express written consent means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarking messages to be delivered." 47 C.F.R. § 64.1200(f)(8)

(vii)     Prohibits unsolicited advertising faxes.

(viii)    Prohibits certain calls to members of the Do-Not-Call Registry.

17.     Furthermore, in 2008, the FCC held that "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules." In re Rules and Regulations Implementing the Telephone Consumer Protection Act, Declaratory Ruling on Motion by ACA International for Reconsideration, 23 FCC Rcd. 559, 565, ¶ 10 (Jan. 4, 2008); *Birchmeier v. Caribbean Cruise Line, Inc.*, 2012 WL 7062748 (Dec. 31, 2012).

18.     Accordingly, an entity can be liable under the TCPA for a call made on its behalf, even if the entity did not directly place the call. Under those circumstances, the entity is deemed to have initiated the call through the person or entity.

19.     There are just a handful of elements need to be proven for violations of the Do Not Call provision of the TCPA.

## A.     DO NOT CALL VIOLATIONS OF THE TCPA

20.     More Than One Call within Any 12-Month Period. 47 U.S.C. § 227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

21.     Calls to Phones on the Do Not Call List. The TCPA's implementing regulation—47 C.F.R. § 64.1200(c)—provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government." See 47 C.F.R. § 64.1200(c).

22.     Including Wireless Lines on the Do Not Call List. Owners of wireless telephone numbers (aka mobile or cellular phones) receive the same protections from the Do Not Call provision as owners or subscribers of wireline ("landline") phone numbers. 47 C.F.R. § 64.1200(e), provides

that 47 C.F.R. §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,'" which the Report and Order, in turn, provides as follows:

> The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. For the reasons described above, we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers.

23.    The Affirmative Defense of Prior Express Consent. The Ninth Circuit has defined "express consent" to mean "clearly and unmistakably stated." Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 955 (9th Cir. 2009) ("Satterfield")). "Prior express consent is an affirmative defense for which the defendant bears the burden of proof." See Grant v. Capital Management Services, L.P., 2011 WL 3874877, at *1, n.1. (9th Cir. Sept. 2, 2011) ("express consent is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof"); see also Robbins v. Coca-Cola Company, No. 13-cv-132, 2013 WL 2252646, at *2 (S.D. Cal. May 22, 2013).

24.    Telemarketers Must Maintain a List of Persons Requesting Not to Receive Calls. 47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entitles making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request...

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made) and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

**B.    COURTS ENDORSE FEIGNING OF INTEREST TO IDENTIFY OFFENDERS**

25.    The FCC, which is charged with enforcement of federal telemarketing laws, regularly has investigators pose as potential customers, an approach that has also been endorsed by the courts. See e.g., Consent Decree, *United States v. Credit Bureau Collection Services*, No. 2:10-cv-169, Doc. No. 3, § X (S.D. Oh. Feb. 24, 2010) (authorizing FTC to use "lawful means," including "posing as consumers and suppliers" to monitor and investigate compliance with federal law).

26.    TCPA plaintiffs are permitted to engage in the same type of practice as the FCC:

Cognizant of how damaging Mey's evidence is, Defendants disparage her as a "professional litigant" who "earns her living by selling things on eBay and by being a plaintiff in class action TCPA lawsuits." 12/14/15 Tr. at 41. (They neglect to

mention that she is also supported by her spouse. Doc. 100-3 at 5- 6.) According to Defendants, Mey's statements should be ignored because she often misrepresented to telemarketers that the name "Lifewatch" appeared on her caller identification in order to elicit their connection to Lifewatch. Doc. 100 at 16. But the telemarketers' admissions are not rendered invalid just because Mey (successfully) tricked them into (truthfully) revealing that they sold products for Lifewatch.

*FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 771 (N.D. Ill. 2016).

27.     Posing as an interested consumer is an approach endorsed by Courts in order to ascertain the identity of the calling party and hold them responsible:

> The calls show that Cunningham appears to have been very good at eliciting information from the callers that he could later use in this lawsuit, which the RRMS Defendants suggest demonstrates that he was cultivating a TCPA claim. Cunningham's Second Amended Complaint, though, openly admits that the reason he eventually accepted one of the calls was 'to ascertain the identity of the party placing' them, and Cunningham has explained his sleuthing in significant detail himself. (Doc. No. 57 at ¶ 13.) His later pleadings are entirely straightforward that he was in fact cultivating a claim. (Doc. No. 85 at 10 ('The only reason why the Plaintiff faked interest in the calls was to identity the seller of the goods/services that was behind the calls.')) ... [i]t is safe to say that, when the telemarketers in this case called a phone belonging to Cunningham, they – presumably unwittingly – found themselves in the sights not of an ordinary hapless consumer, but a seasoned plaintiff, likely primed and ready to take them to court if their actions violated the TCPA. Nothing in the Constitution, through, requires a plaintiff to be a naïf.

*Cunningham v. Rapid Resp. Mon, Servs.*, 251 F. Supp. 3d 1187, 1194-95 (M.D. Tenn. 2017)

## C.     TEXT MESSAGES ARE THE SAME AS CALLS UNDER THE TCPA

29.     Text message are considered calls under the TCPA. *See Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 666-67 (2006) ("A text message to a cellular ... telephone qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."). For the same reasoning, and since federal court decisions are looked to for guidance, text messages would be considered calls under the MTSA. See, e.g., *Com. v. Fall River Motor Sales, Inc.*, 409 Mass. 302, 311, 565 N.E.2d 1205, 1211 (1991) ("Federal court decisions interpreting and applying the Federal Trade Commission Act are to be looked to for guidance in interpreting the provisions of G.L. c. 93A.")

## FACTUAL ALLEGATIONS

30.     The allegations of paragraph 1 through 29 of this Complaint are realleged and incorporated by reference.

31.     Doane has a spinal injury with resulting chronic pain and sleep disorder, he often sleeps during the day or odd hours, and interruptions of sleep causes him distress, somnolence, fatigue, and increased pain.

32.     Doane is the trustee of several trusts, is the primary caretaker and power of attorney for his two elderly parents and stepmother suffering from dementia, and he must be available to answer his cellphone at all times.

33.     At all times relevant, Doane's cellphone number, 781-245-6577, which was the number he had since a child, and which has since been assigned to his cellphone, has been registered to a "do not call list" maintained by the FTC. A true copy of a printout confirming of the FTC do not call registration is attached herewith as **"Exhibit 1"** and incorporated herein by reference.

34.     Calls registered with the FTC are automatically included in the Massachusetts do-not-call list subject to the Massachusetts Telemarketing Solicitation Act, G.L. c. 159C §7 ("MTSA").

35.     For the last several years, Doane has been receiving unsolicited telemarketing calls using automatic telephone dialing systems ("ATDS"), and spoofing (fake caller identification), attempting to solicit the sales of various vehicle-related products and services, and Doane, frustrated with these calls and the disruptions they caused, engaged in various tactics in an attempt to identify those responsible so he could hold them accountable for the illegal conduct.

36.     The calls Doane received used various different spoofed numbers, often with local prefixes, and upon Doane picking up, there was a delay, an audible click, a "boop" sound before an agent would speak attempting to sell vehicle-related products and services.

37.     Doane, when prompted by a telemarketer for his name, as part of a tactic for the sole purpose of attempting to identity those behind the unsolicited calls would sometimes provide an alias rather than his real name.

38.     At some time approximately during 2017 or 2018, Doane, in response to an illegal telemarketer's request for his name, provided an alias that the telemarketer apparently transcribed as "Edgar Vazquez." Further, the telemarketer transcribed an inexistent address of 5953 Deerfield Road, Wakefield.

39.     Subsequent to Doane providing the alias to a telemarketer over the phone, Doane began receiving other unsolicited telemarketing calls during which the agent referred to Doane as the alias he had previously provided, establishing a link between the prior call and subsequent calls.

40.     Doane subsequently received not less than twenty calls referring to him as the alias he had previously provided.

41.     For example, on January 30, 2019, Doane received an unsolicited spoofed call from a female agent with a foreign accent addressing Doane as "Edgar," attempting to sell Doane auto insurance, when at no time did Doane provide prior express written consent to be called regarding auto insurance.

42.     Long after Doane provided the alias to the telemarketer over the phone, he also began receiving text messages on his wireless phone addressed to "Edgar," attempting to sell a variety of products and services, when at no time did Doane provide his prior express written consent to receive text messages. In some instances, the messages included an address of 5953 Deerfield Road, again establishing a link between the text messages and the prior illegal telemarketing.

43.     For example, on April 2, 2019, Doane received a text message from "1 (410) 100-01" stating the following;

> FRM:Marcie nelson
> MSG:Edgar Vazquez 5953
> Deerfield road WAKEFIELD
> http://nuthryhg.world/jTAVkpPgy

Upon clicking on the link, Doane was brought to a website offering car loans.

44.     At all times relevant, the Defendants were involved in and worked together in the business of promoting the sales of subscription products, e.g., automotive magazines, and

through MotorTrend, the sales of motor vehicles, and apparently the financing of same in collaboration with others.

45.     At no time did Doane provide prior consent to receive telemarketing calls or texts involving the Defendants' subscription products, or motor vehicles, or financing of motor vehicles, nor did Doane even express an interest in such products or services during any telemarketing call, nor did Doane ever provide consent online using the alias he provided over the phone during the earlier described unsolicited telemarketing call made to Doane.

46.     Defendant MotorTrend contracted with defendant Xanadu to promote MotorTrend products and services through the unsolicited text messaging of wireless telephones.

47.     On April 22, 2019, at 9:19 AM, Doane received a text message from "467-58," attempting to solicit used vehicle related business, which woke Doane up. The messages stated as follows:

> Lending Cloud 365: Used Car Deals! Zero Down and $129/mo! Malibu's Impala's. Corola's & more! Bad Credit ok! http://find-usedcars.info Txt STOP to OptOut

48.     To investigate who was responsible, Doane clicked the link, and a website flashed, "advantagegoody.com," automatically directing Doane to quotes.motortrend.com, a website determined to be owned by Motor Trend Group. No further action was taken.

49.     On May 13, 2019, at 9:30 AM, another text message received from "467-58," attempting to solicit used vehicle related business, which woke Doane up. The messages stated, similar to the last, as follows:

> Lending Cloud 365: Get a 2015 Chevy Malibu for Zero Down and $119/mo! Others to choose from too! Bad Credit ok! http://used-autos-here.info Txt STOP to OptOut

50.     Again, to investigate who was responsible, Doane clicked the link, and again, the same website flashed, "advantagegoody.com," again automatically directing Doane to quotes.motortrend.com, the website owned by Motor Trend Group. No further action was taken.

51.     The text message, while it was sent on behalf of MotorTrend, did not disclose the party on whose behalf the message was being sent, and the only way to make the determination was to click on the link, which eventually identified MotorTrend.

52.     On May 13, 2019, Doane sent MotorTrend and its officers a demand letter ("Demand Letter"), demanding the unsolicited text messages stop, and that MotorTrend immediately identify those operating on its behalf who were involved with the text messages. A true copy of a Demand Letter is attached herewith as **"Exhibit 2"** and incorporated herein by reference.

53.     Despite MotorTrend receiving the Demand Letter, similar text messages directing to MotorTrend continued, i.e., one on May 31, 2019, at 9:33 AM, and June 12, 2019, at 9:33 AM.

54.     Since MotorTrend did not respond to the Demand Letter, on June 17, 2019, Doane sent MotorTrend and its officers a notice of intent to sue. A true copy of the notice is attached herewith as **"Exhibit 3"** and incorporated herein by reference.

55.     Despite MotorTrend receiving a notice of intent to sue, Doane still received text messages directing to MotorTrend, with another received on June 27, 2019, at 6:42 PM.

56.     As of the filing of this complaint, the Defendants, without Doane's prior consent, texted Doane's cellphone not less than five (5) times attempting to promote MotorTrend's subscription products, which led to MotorTrend's website where vehicles are apparently sold through MotorTrend in collaboration with others. A true copy of screen shots are attached herewith as **"Exhibit 4"** and incorporated herein by reference.

57.     On July 9, 2019, MotorTrend's Vice President and Head of Legal responded via email, stating in relevant part, "I have been able to identify the appropriate and responsible company," which was identified as "Xanadu Marketing," who MotorTrend claimed to have "indicated to an intermediary that it is willing to take responsibility and engage with you to address these complaints towards resolution."

58.     While the text messages Doane received contained a link directing to a MotorTrend website, and MotorTrend was clearly benefiting from the text message campaign, MotorTrend claimed it "has no involvement with Xanadu Marketing nor any practices that violate TCPA and/or the MTSA." A true copy of the email chain is attached herewith as **"Exhibit 5"** and incorporated herein by reference.

59.   According to deepwhois.com, the name servers for the "lendingcloud365.com" domain are "NS1.XANADUMARKETING.COM," and "NS2.XANADUMARKETING.COM.

60.   Joe Defgauw, the registered sole officer of Xanadu, and also the self-proclaimed officer of "The H.O.M.E. Program," advertises on his LinkedIn page stating, "Our Feed has over 2 Million Leads." And, "We sell the leads for only .006 per records and it includes name, emai (sic), phone, ip, date stamp and source url." A true copy of the LinkedIn ad is attached herewith as **"Exhibit 6"** and incorporated herein by reference.

61.   Xanadu advertised on "mymediads.com" stating, "We have professional partnerships with all sorts of brands in the call center vertical, allowing us to harness your leads for conversions and generate as much revenue as possible for you and your business. Live transfers, warm transfers, pay-per-call, it doesn't matter: we can handle all of it, and if you're interested in buying leads, we can do that, too." A true copy of the ad attached herewith as **"Exhibit 7"** and incorporated herein by reference.

62.   Angie Cole, the director at Xanadu since 2016, states that her activities at Xanadu include "Manage … outside call centers … [and] quality of leads and outside call centers to focus on improving quality and revenue." A true copy of the director's LinkedIn page is attached herewith as **"Exhibit 8"** and incorporated herein by reference.

63.   The Better Business Bureau website reveals numerous other complaints regarding "Lending Cloud 365", Xanadu's apparent trade name. For example;

i.   A complaint reported on July 11, 2019, states, "They keep texting my phone … I'm on the do not call list and nor did I contact them for anything."

ii.   A complaint reported on June 2, 2019 states, "Continues texts to my phone. I have no idea who this is and how they got my phone number continues texts to my phone on things I have no interest in, nor did I request information on."

iii.   A complaint reported on May 29, 2019, states, "They text me every day and when I text back STOP, it won't go through. PLEASE have them take my number off their list. I receive text

messages every day from these people, when I text back STOP as instructed, it won't go through."

iv. A complaint reported on May 19, 2019, states, "Stop sending me text, I keep blocking your numbers and you keep sending me stuff!!!!!!! Stop, please stop."

v. A complaint reported on May 15, 2019, states, "I've texted to opt out but still getting texts. Didn't sign up for this so they got my number w/o my consent. Never heard of them until texts. I've texted to opt out but still getting texts. Didn't sign up for this so they got my number w/o my consent. Never heard of them until texts."

vi. A complaint reported on May 17, 2019, states, "Receiving spam text messages even though I never gave them my phone number. I randomly began receiving text messages about used cars even though I never to my knowledge have given any information to any car dealership. I don't know how they got my number but I get a text at least once per day."

vii. A complaint reported on April 29, 2019, states, "They constantly send me text and when I try to stop they say cannot be sent I am text every 15 minutes I want them to take me off their list They keep sending texts that I want them to stop."

viii. A complaint reported on April 24, 2019, states, "Receiving text messages and being charged for a service I NEVER requested. I need them/Lending Cloud to remove my information from their company data. I don't have any business with Lending Cloud 365. I need them/Lending Cloud 365 to remove my information from their company data."

ix. A complaint reported on April 5, 2019, states, "Repeated texts offering homes for sale and rent - OPT out as instructed and still continue to get texts. Opt out does NOT work."

The above are just a few of the numerous complaints from others regarding Xanadu's conduct. A true copy of the Better Business Bureau website complaints are attached herewith as **"Exhibit 9"** and incorporated herein by reference.

64.    On July 9, 2019, Doane sent an email to Xanadu's corporate counsel inquiring into the alleged indemnification MotorTrend referred to.

65.    On July 10, 2019, Xanadu's corporate counsel replied stating in relevant part;

> I have my people looking into the facts surrounding this situation. At the moment
> it appears that on March 16, 2019, at approximately 5:31 pm, someone using the
> name Edgar Vazquez provided the phone number (781) 245-6577 in response to
> an internet offer and granted permission to be contacted at that number. As such,
> the alleged texts messages were never sent to you, but rather to Mr. Vazquez who
> consented to receive them.

A true copy of the email chain attached herewith as **"Exhibit 10"** and incorporated herein by
reference

66.    On July 10, 2019, Doane replied to Xanadu's corporate counsel stating in relevant part;

> The conclusion that the text messages were not sent to me is incorrect. I am the
> subscriber to the [phone number in which the offending text messages are sent].[3]
> There is now another later (sic) to this. The name you have was provided over the
> phone to an illegal telemarketer using a spoofed number for the sole purpose of
> attempting to identify the party responsible. It looks like that is now being
> accomplished. If an upstream party is alleging consent, please provide the website
> on which it was allegedly given, the IP address captured, time and date (I suspect
> it was a while ago), and all other information allegedly entered on the site
> associated with the alleged consent. The alleged web-based consent was never
> provided, now (sic) was any consent given over the phone. The web-based
> consent, assuming it exists, is fraudulent, and it should have been clear with a
> little due diligence. Since what occurred occurred, it's not possible for the website
> to have been compliant with the e-sign act, and associated state law requiring a
> means of confirming that the party signing is in fact who they say they are.

67.    Doane further stated in the email, "Since you have the demand letter, I'll incorporate that
in this email by reference, with the conspirator being replaced by your company, and with all
deadlines therein applicable commencing upon the date of your return." (counsel had indicated in
a prior email that he was away). A true copy of the email chain and correction is attached
herewith as **"Exhibit 11"** and incorporated herein by reference.

68.    On July 23, 2019, Xanadu's corporate counsel replied stating in relevant part,

> Xanadu Marketing is not a telemarketer, but rather a marketing company that
> contacts individuals who have provided their information in response to products
> and/or services that the individual has expressed interest in.

---

[3] Doane, in a subsequent email, made a clarification/correction, which the brackets here reflect.

At some point after March 16, 2019, Xanadu Marketing purchased the Edgar Vazquez lead from a company named Coxswain Consultancy. However, we now know, from your email dated July 11, 2019, that Mr. Vazquez did not provide this information. In that email you admitted that you yourself fraudulently provided the information and Mr. Vazquez's name to Coxswain Consultancy…

It now appears that you are seeking financial gain from your illegal use of Mr. Vazquez's identity.

Filing a lawsuit as a result of actions taken in response to information provided through what can only be described as identity theft is a very risky venture. In doing so you expose yourself to potential charges of extortion, identity theft and various fraud-based offenses. I would caution you in doing so. I have located Mr. Vazquez and I am currently in the process of communicating with him regarding this incident.

As I previously stated, the phone number (781-245-6577) and information you provided has been removed from the company database and there should be no further communication involving the phone number in question. I believe this concludes all issues related to this matter.

A true copy of the email is attached herewith as **"Exhibit 12"** and incorporated herein by reference.

69.     Doane researched Coxswain Consultancy and only found a company by the name of Coxswain Consultancy, Pvt. Ltd., an Indian company located at Flat No-707, 7th Floor, Emerald Block, Foyer Infinity, Pattandura Agrahara, Bangalore, KA 560066, India, the directors being Siddhartha Rai and Vanita Singh.

70.     As far as can be ascertained, Coxswain Consultancy Pvt. Ltd., has no website, no phone number, nor could anything be found indicating the company is involved in providing vehicle related lead services.

71.     Despite Doane's demand that Xanadu provide information regarding the alleged consent involving Doane's number (such as the website where consent was allegedly given, other information allegedly entered thereon, and the IP address captured), Xanadu refused to provide that information, while later, Xanadu's counsel suggested without evidence (in contrast to its initial suggestion that there was some kind of web-based consent), that Doane called Coxswain Consultancy in India and provided his phone number, and this made it permissible for Xanadu to contact Doane via text messages. Xanadu later threatened to sue Doane for defamation.

72.      Xanadu written response to the Demand Letter, which was incorporated by reference in the email sent to Xanadu's counsel, was to make threats and false claims against Doane.

73.      Doane, outraged at Xanadu's corporate counsel's threats and false claims, as well as Xanadu's refusal to provide information, such as Xanadu's do-not-call policy, replied stating in part, "It's my number involved. There was never consent. Your conspiracy is exposed." Further, Doane reiterated, "Your on notice of your obligations to preserve all relevant evidence."

74.      Upon information and belief, Xanadu also texted Doane's cellphone in collaboration with companies other than Motor Trend attempting to solicit sales of auto insurance, loans, and student loan relief services, and other things.

75.      At no time has Doane provided Defendants with consent to call or text him, nor has Doane entered the name "Edgar Vazquez" on any website, nor has Doane provided the name over the phone on the date and time alleged by Defendants, although, Doane did provide the alias to a telemarketer who called Doane illegally using ATDS and a spoofed number without Doane's consent, long before the date Defendants claim that a web-based consent was allegedly given.

76.      MotorTrend was provided with thirty days to respond to Doane's demand, and it failed to timely do so, while the offending text messages continued.

77.      Xanadu's corporate counsel was provided several weeks to respond, but failed to do so in any meaningful way. Instead, Xanadu's counsel claimed to have communicated with the alleged real Edgar Vazquez about Doane's alleged illegal use of Vazquez's identity, suggested Doane could be found criminally liable for identity theft if he brought suit against Xanadu, and finally, counsel threatened to sue Doane for defamation, all simply because Doane's sent the defendants a 30-day G.L. c. 93A pre-suit demand letter complaining of unsolicited and illegal text messages, and later, complaining that the alleged lead Xanadu was relying on was linked to numerous unsolicited and illegal telephone solicitations, using spoofing and ATDS, which Doane had received.

78.      Xanadu's corporate counsel has not provided information as to the Edgar Vazquez he has been in contact with alleging Doane was stealing his identity, and according to WhitePages, there are hundreds Edgar Vazquez's throughout the country, none of whom could be residing at a Deerfield Street, Wakefield address, because no such address exists.

79.    The Defendants' illegal telephone solicitation activities, both underlying calls and subsequent text messages, have caused Doane actual harm, including but not limited to, invasion of privacy, interrupted sleep resulting somnolence, aggravation, mental anguish, emotional distress with physical manifestations, increased pain, waste of time, diminished value and utility of his cellphone, the wear and tear caused to his cellphone, the loss of battery charge, the loss of battery life, and per-kilowatt electricity cost required to recharge his cellphone as a result of increased usage of his cellphone.

80.    The Defendants forced Doane to have to expend time and effort in an attempt to identify those responsible and get the harassing and unlawful activities to stop, and as a result, Doane incurred expense in the form of time, materials, and use of equipment.

81.    The Defendants conspired with each other to engage in the unlawful activities described herein, and each benefited therefrom, to the substantial harm of Doane, and likely to the substantial harm of thousands if not hundreds of thousands of others.

82.    Xanadu's false and unfounded representation that Doane engaged in identity theft, and that they were reporting this to who Xanadu claimed was the real Edgar Vazquez (without disclosing which of the hundreds of persons they were reporting this to), while Xanadu knew the use of an alias is not criminal, and the address associated with the name did not exist, was a threat to Doane, and this threat was an attempt to coerce Doane from exercising his legal rights, and Xanadu's threat caused Doane distress, concern, worry, loss of sleep, and other harms.

## COUNT I
### (Violations of the Telephone Consumer Protection Act, 47 U.S.C. §227(b)(1)(A))
### (As to All Defendants)

83.    The allegations of Paragraphs 1 through 82 of this Complaint are realleged and incorporated by reference.

84.    A private right of action exists pursuant to 47 U.S.C.A. § 227(c)(5) of the TCPA, 47 U.S.C. § 227(b)(1)(A), for violation of the prohibitions against use of ATDS and prerecorded messaging.

85.    Doane was a "person" as defined by TCPA, 47 U.S.C. §§ 227 et seq.;

86.    Each call Defendants made to Doane was a "telephone solicitation" as defined by TCPA.

87.    All that is required for a call to be considered a telephone solicitation is that it is encouraging the purchase of goods and services. The FCC has said, "We ... decline to establish an exemption for calls made to set "face-to face" appointments.... We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore fall within the statutory definition of telephone solicitation." *See* In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, the CG Docket No. 02-278, FCC 03-153, July 3, 2003.

88.    Each call Defendants initiated attempted to sell Doane products and services such that the calls qualify as a telephone solicitation within the meaning of the TCPA.

89.    The Defendants violated 47 U.S.C. §227(b)(1)(A)(iii) by calling Doane's cellphone, without Doane's prior express written consent, using an ATDS.

90.    The TCPA defines ATDS as "equipment which has the capacity...to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. §227(a)(1).

91.    Based on the delay, click, and lack of prompt human response during the calls Doane answered, and the frequency of the calls, Defendant or their agents used a predictive dialing system to place calls to Doane's cell phone.

92.    "A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists [caller] in predicting when an [agent] will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

93.    "When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the capacity 'to store or produce telephone numbers to be called, using a random or sequential number generator.'

Accordingly, a system need not actually, store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it.

94.     The FCC has determined that predictive dialing systems are a form of ATDS. *Id.*

95.     Upon informant and good faith belief, and in light of the number, character and nature of the calls and text messages, including their form, Defendant called and sent its text messages to Doane's cellular telephone number using an ATDS as defined by 47 U.S.C. § 227(a)(1).

96.     Upon information and good faith belief, and in light of the number, character and nature of the calls and text messages, including their form, Defendant called and sent its text messages to Doane's cellular telephone number by using (a) equipment which has the capacity (1) to store or produce telephone numbers to be called, using a random or sequential number generator, and (ii) to dial such numbers, or (b) technology with the capacity to dial random or sequential numbers, or (c) hardware, software, or equipment that the FCC characterizes as an ATDS.

97.     Defendants, in the course of a conspiracy, repeatedly violated 47 U.S.C. §227(b)(1)(A)(iii), by placing **not less than ten (10)** telemarketing calls to Doane's cellphone using ATDS, and not less that five (5) text messages using ATDS, without Doane's prior express written consent.

98.     Pursuant to 47 U.S.C. § 227(b)(3)(B), the Defendants are liable to Doane for a minimum of $500 per violation, or not less than $7,500 for the not less than fifteen (15) such violations.

99.     Pursuant to 47 U.S.C. § 227(b)(3)(C), upon showing willful or knowing violations, statutory damages may be trebled. Defendants' violations of 47 U.S.C. §227(b)(1)(A)(iii) were willful and knowing, and thus Doane is therefore entitled to $7,500 in single damages under this count, trebled to $22,500.

## COUNT II
### (Violations of TCPA Privacy Provisions as Promulgated under 47 U.S.C. §227(c)(1) to (4)) (As to All Defendants)

100.    The allegations of Paragraphs 1 through 99 of this Complaint are realleged and incorporated by reference.

101.   A private right of action exists pursuant to 47 U.S.C.A. § 227(c)(5) of the TCPA, 47 U.S.C. § 227 for violation of the FCC national do-not-call registry, 47 C.F.R. § 64.1200(c)(2) and entity-specific do-not-call list, 47 C.F.R. § 64.1200(d), and regulations promulgated pursuant to the TCPA protection of telephone subscriber privacy rights provisions, 47 U.S.C. § 227(c)(1) to (4).

102.   47 C.F.R. § 64.1200(c) and (d) sets forth certain procedures with which a telemarketer must comply prior to the initiation of a telemarketing call. Prior to initiating telemarketing calls, the person or entity placing the call must adopt specific standards. *Id.* For example, the telemarketer "must have a written policy, available upon demand, for maintaining a do-not-call list." A violation of subsection (d) gives rise to liability under 47 U.S.C. § 227(c)(5).

103.   The Defendants, in the course of a conspiracy, violated 47 C.F.R. § 64.1200(d) by causing telephone solicitation calls to be made to Doane's cellphone without first instituting procedures for maintaining a list of persons who do not wish to receive telephone solicitations made by or on behalf of Defendants, and this gives rise to liability under 47 U.S.C. § 227(c)(5).

104.   The Defendants, in the course of a conspiracy, violated 47 C.F.R. § 64.1200(d)(1) by failing to provide Doane, upon his demand, a do-not-call policy, and this gives rise to liability under 47 U.S.C. § 227(c)(5).

105.   The Defendants, and in the course of a conspiracy, violated 47 C.F.R. § 64.1200(d)(3) by and through the course of initiating telemarketing calls to Doane repeatedly while failing to honor Doane's do-not-call requests, and continuing to call Doane after such requests, and this gives rise to liability under 47 U.S.C. § 227(c)(5),.

106.   Defendants, in the course of a conspiracy, violated 47 C.F.R. § 64.1200(c)(2), by engaging in a pattern or practice of initiating telephone solicitations to Doane's cellphone while said telephone number, at all times relevant, was listed on the FTC's do not call registry, and this gives rise to liability under 47 U.S.C. § 227(c)(5).

107.   During the course of Defendants telemarketing solicitation activities, Defendants, in the course of a conspiracy, violated 47 C.F.R. § 64.1200(d)(4) by failing to immediately provide Doane with a telephone number or address, and this gives rise to liability under 47 U.S.C. § 227(c)(5).

108.    Defendants, in the course of a conspiracy, called Doane not less than ten (10) times attempting to sell auto-related products and services, and Defendants also texted Doane not less than five (5) times attempting to sell auto-related products and services.

109.    The conduct in the preceding paragraphs under this Count total not less than fifteen (15) violations of the TCPA.

110.    Pursuant to 47 U.S.C.A. § 227(c)(5) and the regulations promulgated thereunder, the Defendants are liable to Doane for a minimum of $500 per violation, or not less than $7,500 for the not less than fifteen (15) violations.

111.    Pursuant to 47 U.S.C. § 227(b)(3)(C), upon showing willful or knowing violations, statutory damages may be trebled. Defendants' violations of 47 U.S.C.A. § 227(c)(5) and the regulation promulgated thereunder were willful and knowing, and Doane is therefore entitled to $7,500, in single damages under this Count, trebled to $22,500.

## COUNT III
### Violations of the Massachusetts Telemarketing Solicitation Act, G.L. c. 159C, et seq.
### (As to All Defendants)

112.    The allegations of Paragraphs 1 through 111 of this Complaint are realleged and incorporated by reference.

113.    The Massachusetts Telephone Solicitations Act, G.L. c. 159C et seq., or the "MTSA," and the regulations promulgated thereunder, 201 CMR 12 (the "Regulations"), provide more stringent penalties than the TCPA, and its remedies are not exclusive, i.e., are in addition to all others. *See* § 13.

114.    The MTSA provides a private right of action for "[a] person that receives more than 1 unsolicited telephonic sales call within a 12-month period by or on behalf of the same person or entity in violation of [c. 159C] may … bring an action to recover for actual monetary loss from such knowing violation or to receive not more than $5,000 in damages for such knowing violation, whichever is greater …" *See* § 8(b).

115.    The Regulations require "the telephone solicitor engaging in unsolicited telephonic sales calls to Massachusetts consumers to properly register on an annual basis with the [Office of Consumer Affairs and Business Regulation ("OCABR")] ... along with a statement from an officer of the company affirming that the company will fully comply with the provisions of the [MTSA] and 201 CMR 12.00, et seq." *See* 201 CMR 12.04 (1).

116.    The Defendants, in the course of a conspiracy, called Doane in Massachusetts for the purposes of making telephone solicitations within the meaning of the MTSA and its Regulations.

117.    None of the Defendants were registered with the OCABR at the time they made unsolicited telephonic sales calls to Doane, and thus the Defendants violated the MTSA.

118.    The MTSA and its Regulations also prohibit making unsolicited telephonic sales calls to Massachusetts consumers who are registered on the Massachusetts do-not-call registry. *See* § 3.

119.    The Defendants, in the course of a conspiracy, made not less than fifteen (15) unsolicited telephonic sales calls to Doane, and several of which were after Defendants received a written demand to stop, all while Doane was registered on the Massachusetts do-not-call registry, and thus the Defendants violated the MTSA.

120.    The MTSA and its Regulations also prohibit use of a "blocking device or service to circumvent a consumer's use of a call identification service or device." *See* § 4.

121.    The Defendants, in the course of a conspiracy, made not less than ten (10) calls to Doane using spoofing, and five text messages without a valid and working number, and thus the Defendants violated the MTSA.

122.    The MTSA requires that "[a]ll telephone solicitors engaging in unsolicited telephonic sales calls of Massachusetts consumers shall, at the beginning of such call, disclose [(b) the correct name of the telemarketing company that employs the individual telemarketer who is making the call; [and] (c) the correct name of the ultimate seller whose goods or services are being offered by means of the telemarketing call] ... within the first minute of a telephonic sales call ..." *See* § 5A.

123.    The Defendants, in the course of a conspiracy, did not, during any of the not less than ten (10) spoofed unsolicited telephone sales calls they made to Doane, comply with  § 5A, and thus

the Defendants violated the MTSA, and likewise, Defendants did not immediately identify themselves in each of the not less than five (5) text messages, and likewise violated the MTSA.

124.    Defendants failed to establish or implement, with due care, reasonable practices and procedures to effectively prevent unsolicited telephonic sales calls, in violation of the MTSA.

125.    Doane is entitled to mandatory statutory damages of $5,000 for each violation of the MTSA. *See* § 8(b).

126.    Doane is entitled to statutory damages separate and apart from those under any other federal or state cause of action as "[t]he remedies, duties, prohibitions and penalties provided in [G.L. c. 159C] shall not be exclusive and shall be in addition to all other causes of action, remedies and penalties provided by law, including any applicable remedies pursuant to chapter 93A." *See* § 13.

### COUNT IV
### Invasion of Privacy by Intrusion Upon Seclusion
### (As to All Defendants)

127.    The allegations of Paragraphs 1 through 126 of this Complaint are realleged and incorporated by reference.

128.    G.L. c. 214, § 1B, inserted by St. 1974, c. 193, § 1, provides in relevant part: "A person shall have a right against unreasonable, substantial or serious interference with his privacy."

129.    The *Restatement of Torts, Second*, § 652(b) defines intrusion upon seclusion as "One who intentionally intrudes … upon the solitude or seclusion, or his private affairs or concerns, is subject to liability to the other for invasion of privacy. If the intrusion would be highly offensive to a reasonable person."

130.    Massachusetts further recognizes the Doane's right to be free from invasions of privacy, thus the Named Defendants violated Massachusetts state law.

131.    The Defendants, in the course of a conspiracy, intruded upon Doane's right to privacy by causing Doane cellphone to be called numerous times when the Defendants knew or should have known that Doane did not want to be bothered.

132.    The Defendants calls were so intrusive as to be considered "hounding the plaintiff," and "a substantial burden to his existence," thus satisfying the *Restatement of Torts, Second*, § 652(b) requirement for an invasion of privacy.

133.    The Defendants conduct resulted in multiple invasions of privacy in such a way as would be considered highly offensive to a reasonable person, and it was and continues to be highly offensive to Doane.

134.    As a result of the intrusions and invasions, and in light of the substantial harms Doane suffered, Doane is entitled to his actual damages for such invasions of his privacy, and intrusions upon his seclusion.

## COUNT V
### Intentional Infliction of Emotional Distress
### (As to All Defendants)

135    The allegations of Paragraphs 1 through 134 of this Complaint are realleged and incorporated by reference.

136    The Defendants knew or should have known that emotional distress was likely to result from their conduct as alleged herein.

137    The Defendants conduct as alleged herein was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community."

138    The Defendants conduct was the cause of Doane's distress.

139    The Defendants caused Doane, in addition to that alleged earlier herein, anxiety, irritability, worry, inability to sleep, and the distress Defendants caused was severe.

## COUNT VI
### Violations of the Massachusetts Consumer Protection Act, G.L. c. 93A
### (As to All Defendants)

140    The allegations of Paragraphs 1 through 139 of this Complaint are realleged and incorporated by reference.

141     At all times relevant, the Defendants were engaged in trade or commerce within the meaning of G.L. c. 93A §2.

142     The Defendants, in the course of a conspiracy, engaged in unfair and deceptive practices declared unlawful by G.L. c. 93A.

143     Such acts of unfair competition include, but are not limited to, violations of the TCPA, and the MTSA, the unreasonable invasion of Doane's privacy and intrusion upon his seclusion, and threats in response to Doane's complaints of unsolicited calls and texts messages.

144     The regulations promulgated by the Massachusetts Attorney General, 940 C.M.R. 3.16, state that "[w]ithout limiting the scope of any other rule, regulation or statute, an act or practice is a violation of G.L. c. 93A, § 2 if "… (4) [i]t violates the Federal Trade Commission Act … or other Federal Consumer Protection statutes within the purview of M.G.L. c. 93A, § 2."

145     The Defendants violations of those Federal and Massachusetts statutes, as alleged herein, have each caused Doane actual harm and monetary loss, adequate to render each of those violations of statute, independent from one another, per se violations of G.L. c. 93A, adequate for Doane to have standing to bring an action under G.L. c. 93A.

146     The Defendants conduct as alleged herein, aside from constituting per se violations of G.L. c. 93A, is also facially unfair and deceptive, and thus in violation of G.L. c. 93A.

147     The Defendants, in the course of a conspiracy, systematically placed, on a large scale, unsolicited and harassing telemarketing calls and texts to consumers in Massachusetts, without the Defendants being properly registered, without complying with federal law or Massachusetts law, without disclosing who they were, using deceptive caller identification, calling repeatedly, using different numbers, and texting repeatedly, without regard to the privacy interests of those they called and texted, and with no controls in place, all in order to aggressively market their products, all of which results in substantial injury to Massachusetts consumers, while giving Defendants an unfair advantage over businesses that solicit lawfully.

148    The Defendant call and text harassment campaign is against public policy, immoral, unethical, and oppressive, caused Doane substantial harm, and poses a substantial risk of causing others throughout Massachusetts substantial harm.

149    Doane sent defendant MotorTrend a Demand Letter under the provisions of the G.L. c. 93A, demanding the offensive conduct stop, including the calls, and certain information, and defendant MotorTrend did not timely respond, while the text messages continued.

150    Doane sent defendant Xanadu the Demand Letter under the provisions of the G.L. c. 93A, incorporated by reference in an email to counsel, also demanding the offensive conduct stop, including the calls, and certain information, and defendant Xanadu responded with threats.

151    The Defendants failed to timely respond to the G.L. c. 93A Demand Letter with a reasonable offer of settlement, when their conduct is facially and per se unfair and deceptive, which Defendants knew, and therefore also on this basis the Defendants violated of G.L. c. 93A.

152    The Defendants violations of G.L. c. 93A were willful and knowing, and Defendants forced Doane to litigate.

153    As a direct and proximate cause of Defendants conduct, Doane suffered the harms alleged herein, and has no assurance that the Defendants illegal conduct will cease.

154    Doane is entitled to an award of his actual damages, the multiplication of same under the provisions of G.L. c. 93A, as to each of the Defendants, without the right of contribution.

155    An award of punitive damages is appropriate because the Defendants conduct is outrageous, willful and wanton, and showed reckless disregard for the rights of Doane and Massachusetts consumers generally.

## COUNT VII
### Negligence in Hiring and Retention
### (As to MotorTrend and Xanadu)

A.    **MotorTrend**

156    The allegations of Paragraphs 1 through 155 of this Complaint are realleged and incorporated by reference.

157     Xanadu is not registered with the Massachusetts OCABR, as required by G.L. c. 159C et seq., pursuant Regulations thereunder, while such registration is the only way to obtain the Massachusetts do-not-call registry. Yet, MotorTrend contracted with Xanadu to conduct telemarketing on its behalf anyway.

158     Prior to Xanadu's calls to Doane, MotorTrend had information available to them indicating that Xanadu made calls unfairly, deceptively, and in violation of law, or was otherwise unqualified to make calls on behalf of MotorTrend, yet, MotorTrend did nothing other than continue to use Xanadu to make calls on behalf of MotorTrend.

159     MotorTrend knew or should have known of Xanadu's propensity for violating the law, MotorTrend was negligent in hiring and in retaining Xanadu, and as a result, Doane suffered the harms alleged herein.

**B.     Xanadu**

160     Xanadu's foreign agent is not registered with the Massachusetts OCABR, as required by G.L. c. 159C et seq., pursuant Regulations thereunder, while such registration is the only way to obtain the Massachusetts do-not-call registry. Yet, Xanadu contracted with their foreign agent to conduct telemarketing on its behalf anyway.

161     Prior to Xanadu's foreign agent's calls to Doane, Xanadu had information available to them indicating that their foreign agent made calls unfairly, deceptively, and in violation of law, or was otherwise unqualified to make calls on behalf of Xanadu, yet, Xanadu did nothing other than continue to use their foreign agent to make calls on its behalf.

162     Xanadu knew or should have known of their foreign agent's propensity for violating the law, Xanadu was negligent in hiring and in retaining their foreign agent, and as a result, Doane suffered the harms alleged herein.

**COUNT VIII**
**Defamation by Slander**
**(As to Xanadu)**

163     The allegations of Paragraphs 1 through 162 of this Complaint are realleged and incorporated by reference.

164   Xanadu's agent made a statement, concerning Doane, to a third party, alleging Doane stole that party's identity, a crime.

165   Xanadu's statement was defamatory such that it damaged Doane's reputation in the community.

166   Xanadu was at fault in making the statement.

167   Xanadu's defamatory statement is actionable without proof of economic loss.

<u>COUNT IX</u>
**Violations of the Massachusetts Civil Rights Act, G.L. c. 12, § I**
**(As to Xanadu)**

168   The allegations of Paragraphs 1 through 167 of this Complaint are realleged and incorporated by reference.

169   The Massachusetts Civil Rights Act, G.L. c. 12, § I ("MSRA"), states in relevant part:

> Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court.

170   Section 11H of the MSRA states in relevant part:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth …

171   Xanadu, in an attempt to coerce Doane from exercising his right to be left alone, and to be free from invasions of privacy and intrusions upon his seclusion, as protected by Massachusetts law, and in an attempt to coerce Doane from his right to petition and seek redress and damages for violations of same, so Xanadu could continue its illegal practices without

interference from Doane, threatened Doane by falsely claiming, through its agent attorney, that Doane committed a criminal act, i.e., identity theft, and that they were reporting this to others who could take the allegation as true, to Doane's potential harm.

## COUNT X
### Conspiracy
### (As to All Defendants)

172    The allegations of Paragraphs 1 through 170 of this Complaint are realleged and incorporated by reference.

173    The Defendants, pursuant to an agreement with each other, acted in concert to commit the acts alleged herein, and the Defendants all sought to profit and seek a competitive advantage, a goal the Defendants would not have been able to accomplish acting independently.

## COUNT XI
### Claims Against the John and/or Jane Doe(s) and/or XYZ Company

174    The allegations of Paragraphs 1 through 173 of this Complaint are realleged and incorporated by reference.

175    To the extent any claim made in this complaint against the named defendants are attributable solely against any unknown defendant(s), or in the event that any unknown defendant(s) may be jointly and/or severally liable, such claims are incorporated in this Count by reference, and upon discovery of all the true identities of any and all such unknown defendants, this complaint shall be amended accordingly.

**WHEREFORE**, as to all Counts, the Plaintiff requests that this Court:

1. Enter judgment for the Plaintiff against the Defendants and other conspirators as may be so determined;

2. Counts I and II, pursuant to the provisions of the TCPA, award Doane statutory damages of not less than $500 for each of the not less than thirty (30) violations thereof, or not less than $15,000, and treble same for knowing and intentional violations thereof as provided thereunder, to not less than $45,000, jointly and severally, as to each of the defendants and other conspirators, or otherwise as to those found so liable;

3.  Count III, pursuant to the provisions of the Massachusetts Telemarketing
    Solicitations Act, G.L. c. 159C, et seq., award Doane statutory damages of not
    less than $5,000 for each of the numerous violations thereunder, as provided
    under G.L. c. 159C § 8(b)(ii), jointly and severally, as to each of the defendants
    and other conspirators, or otherwise as to those found so liable;

4.  Count IV and V, award Doane his actual damages arising from intrusive calls for
    invasion of privacy and intrusion upon seclusion, and intentional infliction of
    emotional distress, jointly and severally, as to each of the defendants and other
    conspirators, or otherwise as to those found so liable;

5.  Count VI, apply Doane's actual damages under Count IV and V to the provisions
    of the Massachusetts Consumer Protection Act, G.L. c. 93A, et seq., and treble
    Doane's actual damages as provided under G.L. c. 93A §9(3) as punitive
    damages, as to each of the defendants and other conspirators, or otherwise as to
    those found so liable;

6.  Count VII, find, in the alternative, that defendants were negligent in hiring and
    retention, and award damages as so determined;

7.  Count VIII, find defendant Xanadu defamed Doane by slander, and award Doane
    damages as so determined;

8.  Count IX, find defendant Xanadu violated Doane's civil rights, in violation of the
    Massachusetts Civil Rights Act, G.L. c. 12, § I, and award Doane compensatory
    damages, costs of litigation, and his attorney fees, if any, as provided thereunder;

9.  Count X, find defendants engaged in a conspiracy to commit the wrongful acts
    alleged herein, and as conspirators, find defendants liable jointly and severally
    liable as to the applicable counts herein as so determined appropriate; and

10. Award interest, costs, and attorney's fees (if any); and such other relief as this
    Court deems just and proper.

ROBERT A. DOANE, Pro Se

Robert A. Doane, Pro Se
Mailing and Service Address:
103 Prospect Street
Wakefield, MA 01880
Tel: 781-245-6577
E-Mail: robertdoane@rcn.com

Date:   September 3, 2019

## CERTIFICATE OF SERVICE

I, Robert A. Doane, Plaintiff, pro se, hereby certify that I served a true and correct copy of the foregoing document upon the below defendants by serving a copy thereof via US Mail, on the date set forth below:

**Xanadu Marketing, Inc.**
c/o Edward Winkler, Esq.
Registered Agent
3181 Prairie Street, Suite 104
Grandville, MI 49418

**Motor Trend Group, LLC**
c/o CT Corporation System
Registered Agent
1108 E. South Union Avenue
Midvale, UT 84047

ROBERT A. DOANE, Pro Se

Robert A. Doane, Pro Se
Mailing and Service Address:
103 Prospect Street
Wakefield, MA 01880
Tel: 781-245-6577
E-Mail: robertdoane@rcn.com

Date:    September 3, 2019

Exhibit 1

# Exhibit 1

**From:** **Verify@donotcall.gov** Verify@DonotCall.gov
**Subject:** National Do Not Call Registry - Your Registration is Confirmed
**Date:** June 24, 2015 at 7:01 PM
**To:** robertdoane@rcn.com



Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 6577 on December 30, 2003. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

Exhibit 2

# Exhibit 2

# ROBERT A. DOANE

Martha's Vineyard Residence
Twenty-One New Lane and Seventy Blackthorn Road
West Tisbury, MA 02575

robertdoane@rcn.com

Mailing Address

103 Prospect Street
Wakefield, MA 01880

Tel: 781-245-6577
Facsimile 888.712.2724

13 May 2019

## CONFIDENTIAL AND URGENT

*Sent Via Certified Mail*
Members and Managers
Motor Trend Group, LLC
831 S. Douglas Street
El Segundo, CA 90245

RE:   Demand to Cease and Desist; Immediate Demands and Five-Day
Demands under the Federal Telephone Consumer Protection Act and
the Massachusetts Telephone Solicitation Act; and 30-day Demand
Under the Massachusetts Consumer Protection Act

Dear Members and Managers:

This pre-suit demand letter, required by the Massachusetts Consumer Protection
Act, G.L. c. 93A § 9(3), is directed to Motor Trend Group, LLC, and to each of its
members and managers, including the entitey "TEN: The Enthusiast Network, Inc.," as
well as persons as members and managers in their individual and personal capacities
(collectively "Motor Trend Group").

I am listed on federal and state do-not-call registries. I am the trustee of several
trusts with various legal obligations and responsibilities. I am the power of attorney and
caretaker for my two elderly parents, and stepmother who presently suffers from
dementia. I am frequently in my car traveling. I have several other responsibilities
requiring focus and attention. I also have a sleep disorder often requiring me to sleep odd
hours and during the day. I do not want to be bothered, interrupted, or distracted by
telemarketing calls or texts. I have clearly expressed to the world I do not want to receive
telemarketing calls or texts by registering my number on the Federal and Massachusetts
do not call registries. Given my circumstances, such telemarketing calls and texts are
particularly intrusive, distracting, disruptive, and are outright harassing and constitute an
invasion of my privacy. My patience with these calls and texts has ended. In instances
where my right to be left alone is not respected, ill take action.

Motor Trend Group and its coconspirators, as agents acting on behalf of Motor
Trend Group, have been determined responsible for, among other things, causing text
messages to be sent, likely to thousands of cellphones throughout Massachusetts, which
included mine, without regard to those listed on state and federal do-not-call registries,

and without prior consent, in violation of the Telephone Consumer Protection Act 47 U.S.C. §227, et seq. ("TCPA"), and the Massachusetts Telephone Solicitation Act, G.L. c 159C, et seq. ("MTSA").

At all times relevant, my cellphone with the number 781-245-6577 has been registered on both federal and state do-not-call registries. At no time was prior express written consent given to call or text my cellphone.

On April 22, 2019, at 9:19 AM, a text message received from "467-58," attempting to solicit used car related business, and which woke me up. The messages stated as follows:

> Lending Cloud 365: Used Car Deals! Zero Down and $129/mo! Malibu's Impala's.
> Corola's & more! Bad Credit ok! http://find-usedcars.info Txt STOP to OptOut

To investigate who was responsible, the link was clicked, and a website flashed, "advantagegoody.com," and then landed to quotes.motortrend.com, a website determined to be owned by Motor Trend Group. No further action was taken.

On May 13, 2019, at 9:30 AM, another text message received from "467-58," attempting to solicit used car related business, and which woke me up. The messages stated, similar to the last, as follows:

> Lending Cloud 365: Get a 2015 Chevy Malibu for Zero Down and $119/mo! Others
> to choose from too! Bad Credit ok! http://used-autos-here.info Txt STOP to OptOut

Again, to investigate who was responsible, the link was clicked, and again, the same website flashed, "advantagegoody.com," and then landed to quotes.motortrend.com, which as noted above, is a website determined to be owned by Motor Trend Group. No further action was taken.

The text message, while sent on behalf of Motor Trend Group, did not disclose the party on whose behalf the message was being sent.

As Motor Trend Group and its conspirators, as agents acting on behalf of Motor Trend Group, are likely aware, text messages (hereinafter "calls") are considered calls within the meaning of the TCPA, and the MTSA.[1]

---

[1] On multiple occasions, the FCC, has expressed the view that the statutory term "call" includes text messages to wireless numbers See, e.g., In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C.R. 14014, 2003 WL 21517853 (F.C.C. 2003), on reconsideration in part, 18 F.C.C.R. 16972, 2003 WL 21961003 (F.C.C. 2003) and modified in part, 19 F.C.C.R. 20125, 2004 WL 2203284 (F.C.C. 2004) and order clarified on reconsideration, 20 F.C.C.R. 3788, 2005 WL 418189 (F.C.C. 2005) and rule modification granted, 20 F.C.C.R. 10736, 2005 WL 1405287 (F.C.C. 2005) and on reconsideration in part, 21 F.C.C.R. 3787, 2006 WL 901720 (F.C.C. 2006), on reconsideration in part, 23 F.C.C.R. 15059, 2008 WL 4567163 (F.C.C. 2008) and order clarified, 23 F.C.C.R. 559, 2008 WL 65485 (F.C.C. 2008) and order amended, 23 F.C.C.R. 9779, 2008 WL 2437522 (F.C.C. 2008); In the matter of Rules and Regulations Implementing the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 19 F.C.C.R. 15927, 2004 WL 1794922 (F.C.C. 2004). Courts have followed suit, with the Ninth Circuit Court of Appeals, for example, concluding that the FCC's

Further, by the very nature of the technology, an advertising text will virtually always be considered an Automatic Telephone Dialing System ("ATDS").[2] The text messages are considered calls, using an ATDS, from which there are two violations of the TCPA per text message. *See Lucas v. telemarketer Calling from (407) 476-5670* (S.D. Ohio, 2013). Citing *Charvat v. NMP, LLC,* 656 F.3d 440, 449 (6th Cir. 2011) (Plaintiff may recover $3,000 per telephone call under the TCPA.)

Under the TCPA, 47 U.S.C. § 227, et seq., a private right of action exists for violation of the Federal Communications Commission's ("FCC") national do-not-call registry, 47 C.F.R. § 64.1200(c)(2) and entity-specific do-not-call list, 47 C.F.R. § 64.1200(d), the regulations promulgated pursuant to the TCPA protection of telephone subscriber privacy rights provisions, 47 U.S.C. § 227(c)(1) to (4). See 47 U.S.C. § 227(c)(5). 47 C.F.R. § 64.1200(c) and (d) sets forth certain procedures with which a telemarketer must comply prior to the initiation of a telemarketing call. *Id.* For example, failing to state the "individual, or other entity that is responsible for initiating the call," and the contact phone number, constitutes a violation of the TCPA. See 47 C.F.R. § 64.1200(b)(1)(2). A violation of subsection (d) gives rise to TCPA liability under 47 U.S.C. § 227(c)(5).

There is likewise a separate cause of action under 47 U.S.C. § 227(c)(5) to cause, without prior express written consent, a cellphone to be called using an ATDS. See 47 U.S.C. §227(b)(1)(A)(iii). Cellphones are completely off limits for automated calls. Under applicable regulations, cellphone are completely off limits for automated calls. See 47 C.F.R. § 64.1200(a)(iii).

Violations of these provisions provides a basis for statutory damages under 47 U.S.C. §227(c)(5) separate from violations of the FCC national do-not-call registry, 47 C.F.R. § 64.1200(c)(2) and entity-specific do-not-call list, 47 C.F.R. § 64.1200(d), and regulations promulgated pursuant to the TCPA protection of telephone subscriber privacy rights provisions, 47 U.S.C. § 227(c)(1) to (4). In other words, as noted earlier, there can be two violations per call, with damages of $3,000 per call.

As to the FCC national do-not-call registry, 47 C.F.R. § 64.1200(c)(2) and entity-specific do-not-call list, 47 C.F.R. § 64.1200(d), and regulations promulgated pursuant to

---

interpretation of the term is entitled to Chevron deference, (See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)), given the ambiguity of the TCPA's text and the reasonableness of the agency's interpretation. Satterfield v. Simon & Schuster, Inc., 569 F.3d 946 (9th Cir. 2009). Other courts have followed the Ninth Circuit in approving the FCC's interpretation. See, e.g., Smith v. Microsoft Corp., 297 F.R.D. 464 (S.D. Cal. 2014); Fried v. Sensia Salon, Inc., 2013 WL 6195483 (S.D. Tex. 2013); Freidman v. Massage Envy Franchising, LCC, 2013 WL 3026641 (S.D. Cal. 2013); Agne v. Papa John's Intern., Inc., 286 F.R.D. 559, 83 Fed. R. Serv. 3d 1181 (W.D. Wash. 2012). At this point in time, then, "calls" to mobile phones restricted by the Act can be assumed to include text messages.

[2] In order to create a text message campaign, the defendant's marketer will begin by creating a list of numbers. This can be done either by manually typing in names and numbers or by importing them from another source, such as a customer database or a commercial database of consumers. The advertiser must then create the text message advertisement. Finally, primed with the call list and the marketing message, the ATDS will proceed to automatically call the numbers on the call list and send the desired message.

the TCPA protection of telephone subscriber privacy rights provisions, 47 U.S.C. § 227(c)(1) to (4), Motor Trend Group's conduct violates one or more of the following: (i) 47 C.F.R. § 64.1200(c)(2), by engaging in and/or causing a pattern or practice of initiating telephone solicitations to my cellphone while said number, at all times relevant, was listed on the Federal Trade Commission's do-not-call registry, 47 C.F.R. § 64.1200(d) by causing telephone solicitations to be made to my cellphone without first instituting procedures for maintaining a list of persons who do not wish to receive such; (ii) 47 C.F.R. § 64.1200(d)(3) by and through the course of initiating calls for the purposes of a telemarketing solicitation by repeatedly failing to honor do-not-call requests and continuing to call despite requests not to be called; (v) 47 C.F.R. § 64.1200(d)(4) by failing to provide a telephone number or address. Any one of the violations above are grounds for statutory damages under 47 U.S.C. § 227(c)(5).

The conduct of Motor Trend Group and its conspirators, as agents acting on behalf of Motor Trend Group, violates numerous provisions of the TCPA and the regulations promulgated thereunder, with each violation subject to separate statutory damages of not less than $500 for negligent violations, and not more than $1,500 for willful and knowing violations.

Motor Trend Group and its conspirators, as agents acting on behalf of Motor Trend Group, conducts its business in complete disregard of the TCPA, and its conduct in any event "caused the calls to be made." Even if another party made the calls on Motor Trend Group behalf, it cannot escape liability.

Under Massachusetts law, as to torts other than negligence causing physical harm, "a principle [of a non-employee agent] is liable for the torts of his agent committed within the scope of his employment." *Red v. A.E. Little Co.*, 256 Mass. 442, 448, 152 N.E. 918, 920 (1926). See Am. Jur. 2d Agency § 264, p. 639 ("A principle is liable for the tortious acts of an agent which are done within the course and scope of the agent's employment."). Such torts include misrepresentation,[3] negligence,[4] invasion of privacy, and other intentional torts.[5] The principal's liability for such tortious acts of its agents is exclusively vicarious, having been imposed by operation of law notwithstanding the principal's lack of fault or involvement in the actionable transaction. *Medeiros v. Middlesex Ins. Co.*, 48 Mass. App. Ct. 51, 56-57, 716 N.E.2d 1076, 1080 (1999).

The TCPA, 47 U.S.C. § 227(c)(5), creating a private cause of action for violations of the FCC national do-not-call registry, 47 C.F.R. § 64.1200(c)(2), and entity-specific

---

[3] See Restatement Third, Agency §§ 7.04, 7.08, comment c. See *Haskell v. Starbird*, 152 Mass. 117, 142 N.E. 695, 696 (1890); *Rousseau v. Gelinas*, 24 Mass. App. Ct. 154, 157-158, 507 N.E.2d 265, 268 (1987); *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 313, 518 N.E.2d 519, 525 (1988); *Putnam v. DeRosa*, 963 F.2d 480, 483-484 (1st Cir. 1992) (applying Mass. law) (principal "is liable for harm flowing from the misrepresentations of its agents, made with its actual or apparent authority.").

[4] *New England Mica Co. v. Waltham Factories*, 301 Mass. 56, 60, 16 N.E.2d 81, 83 (1938).

[5] *Worcester Ins. Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 404, 558 N.E.2d 958, 967 (1990) (assault); *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1376, 33 Fed. R. Evid. Serv. 809, 20 Fed. R. Serv. 3d 409 (1st Cir. 1991) (applying Mass. law) (forged bonds).

do-not-call list, 47 C.F.R. § 64.1200(d), imposes liability on the telemarketer, and on the person or entity on whose behalf the telephone calls were made. In addition to the caller, the statutory and regulatory language creates vicarious liability in the seller for the calls made by its agents.

Specifically, under the TCPA, as interpreted by the FCC under federal common law, a person or entity can be liable for calls made on its behalf even if that person or entity did not directly dial those calls. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum and Order, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995). In 2008, the FCC reiterated, "a company on whose behalf a telephone solicitation is made bears the responsibility for any violations." See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991. Request of ACA International for Clarification and Declaratory Ruling, CG 02-278, 23 F.C.C.R. 559 at ¶10 (Jan. 4, 2008) (specifically recognizing "on behalf of" liability in the context of a Robocall sent to a consumer by a third party on another entity's behalf under 47 U.S.C. 227(b)). In May of 2013, the FCC reinforced this issue. See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, --- FCC Rcd. --- (F.C.C. May 9, 2013) (hereinafter "2013 FCC Ruling Order") (clarifying that "a seller … may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."). Where profitable businesses hire others in an effort to hide their role in telemarketing campaigns, the FCC has ruled, in a wide variety of situations, that companies may be held vicariously liable for calls made on their behalf, including when the companies knowingly benefit from the calls. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013) ("FCC Vicarious Liability Order"). As the FCC explained:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Id; see also id. at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised")"

Motor Trend Group is properly deemed to have initiated the calls, and is liable under a number of theories even if it did not *directly* place the call. Indeed, even if the offending calls did not originate in the United States, which they may not have in this case, Motor Trend Group is liable. See 47 U.S.C. § 227(b).

The TCPA, 47 U.S.C. 227(b)(3) provides consumers harmed by violations of the TCPA with the right to sue, seeking statutory damages of $500 per violation, and the court can order triple damages for willful or knowing violations, or $1,500 per call. "Willfully or knowingly" requires only the intent to make calls, regardless of any intent to violate the TCPA. *Standard Mutual Ins. Co. v. Lay*, 2012 WL 1377599 (4th Dist. April 20, 2012). Under the TCPA, corporate officers may be held personally liable even though acting on behalf of the corporation. See e.g., *Hoops & Associates, P.C. v. Financial Solutions and Associates, Inc.*, 395 S.W. 3d 594 (Mo. Ct. App. E.D. 2013) reh'g and/or transfer denied (Mar. 14, 2013) and transfer denied, (Apr. 30, 2013).

Motor Trend Group and its conspirators, as agents acting on behalf of Motor Trend Group, willfully and knowingly violated the TCPA not less than four (4) times, warranting statutory damages of not less than $6,000 for willful and knowing violations, under the TCPA alone.

Motor Trend Group also violated the MTSA not less than two (2) times, entitling me to damages of not less than $5,000.00 per violation, warranting statutory damages of $10,000 under the MTSA alone. See G.L. c. 159C § 8. The MTSA provides independent grounds for jurisdiction over out-of-state or non-resident defendants to an action or proceeding thereunder. See G.L. c. 159C § 13.

Motor Trend Group also violated the Massachusetts Code of Regulations promulgated under G.L. c. 159C; 201 CMR 12.02 (6), which states that "[a]ll telephone solicitors engaging in unsolicited telephonic sales calls of Massachusetts consumers must institute procedures for honoring the list of Massachusetts consumers who have elected not to receive unsolicited telephonic sales calls in compliance with G.L. c. 159C and 201 CMR 12.00 et seq.," and further, that "[a]ll telephone solicitors engaging in unsolicited telephonic sales calls of Massachusetts consumers shall, at the beginning of such call, disclose [(b) the correct name of the telemarketing company that employs the individual telemarketer who is making the call; [and] (c) the correct name of the ultimate seller whose goods or services are being offered by means of the telemarketing call] … within the first minute of a telephonic sales call …," which Motor Trend Group failed to do.

Such illegal calls to my cellphone attempting to solicit sales are unfair and deceptive, harassing, interfere with my sleep, invade my privacy, cause wear and tear, battery usage, and use cell services, causing expense adequate to have standing under G.L. c. 93A. Aside from the call, the entire process, e.g., sending mysterious texts without disclosing on whose behalf they are being sent, is grossly unfair and deceptive whereby a court would likely award punitive damages under G.L. c. 93A. Moreover, a violation of the above statutes per se violates G.L. c. 93A. Specifically;

Without limiting the scope of any other rule, regulation or statute, an act or

practice is a violation of G.L. c. 93A, § 2 if: (1) It is oppressive or otherwise unconscionable in any respect; or … (3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of thus Commonwealth protection; or (4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of G.L. c. 93A, §2.

940 C.M.R. 3.16

Accordingly, in addition to damages under the TCPA, and the MTSA, this letter makes demand for damages under G.L. c. 93A in the amount of $5,000, which includes the time and expense researching and investigating in order to identify the offender and to write this letter and attempt to get the calls to stop, which is compensable under G.L. c. 93A. *See Casavant v. Norwegian Cruise Line, Ltd.*, 76 Mass. App. Ct. 73, 79, 919 N.E.2d 165, 170 (2009). Review granted, 456 Mass. 1106, 925 N.E.2d 864 (2010) (litigation requiring expense of "time, money and effort" constitutes "injury" under G.L. c. 93A).

### DEMAND

Accordingly, this letter demands Motor Trend Group provide its do-not-call policy, that Motor Trend Group, immediately stop calling my cellphone, immediately provide the identities and contact information of all those agents or companies acting on behalf of Motor Trend Group, if any, provide evidence that Motor Trend Group and its agent is properly registered as a telemarketer with the Massachusetts Office of Consumer Affairs and Business Regulation and that Motor Trend Group immediately notice its commercial liability insurer and provide that insurer's name and contact information.[6] In addition, this letter demands:

    (i)    Under the TCPA, $6,000 in statutory damages, i.e., $1,500 for each of the <u>not less than</u> four (4) willful and knowing violations of the TCPA;

    (ii)    Under the MTSA, $10,000 in statutory damages for the not less than two (2) knowing and willful violations of the MTSA;[7]

    (iii)    Under G.L. c. 93A, $5,000 in actual damages or otherwise a reasonable settlement offer within 30 days, as a compromise.

While an action under the TCPA and MTSA may commence immediately, in the

---

[6] Failure to timely notice a liability insurer of a claim may breach a policy's notice provision, prejudice the insurer, and relieve the insurer from its obligations to defend or pay the claim on behalf of the insured. In some instances no showing of prejudice is required. *See* Persons, R. and Brownlee, K., *Excess Liability Rights and Duties of Commercial Risk Insureds and Insurers*, § 8:15 (4th Ed. 2002).

[7] <u>There is a strong basis to assert a MTSA class action under Massachusetts law, which would – given the damages available thereunder – subject Motor Trend Group and its officers to severe liability</u>.

event Motor Trend Group wishes to resolve this matter without litigation, no civil action will be brought before the expiration of five (5) days.

With respect to the G.L. c. 93A claims, if Motor Trend Group believes the demands are unreasonable, it may investigate the facts and the law and counter with a reasonable offer of settlement within 30 days.

## LITIGATION HOLD NOTICE

Motor Trend Group, and each of its officers, directors, administrators, employees, subcontractors, shareholders, agents, insurers, and successors and assigns as the case may be, and any other party who may have materials relevant to the claims described in this demand letter (the "Litigation Hold Parties"), are hereby put on notice of litigation hold. This notice extends to ALL the "Litigation Hold Parties" as defined *supra*. It is the responsibility of the recipient of this notice of litigation hold to properly identify and notice ALL the Litigation Hold Parties and immediately and properly notice them.

Any and all materials or records relating to the subject of this demand letter must be retained and preserved, including but not limited to all emails, call logs, audio recordings, contracts with third parties or its agents as well as the audio records of your agents, and any alleged prior express written consent. This notice extends to information in Motor Trend Group custody and control relating to any and all claims by any person, company, or entity, accusing it of violating the TCPA, MTSA, or the consumer protection act of any state, or that which may be relevant to this claim. The scope of this litigation hold is broad, as aside from this claim, a class action claim is seriously being contemplated.

**Accordingly, the Litigation Hold Parties must not destroy, conceal or alter any paper or electronic files or communications or data generated by and/or stored on any computer or storage media (e.g. hard disks, thumb drives, compact disks, tapes, cloud storage, etc.). Such files shall be considered to include all those devices on which communications involving company business take place, such as but not limited to computer consoles, cell phones, smart phones, tablets, laptops, whether stored on company site or elsewhere. Communications subject to this notice of litigation hold shall include but are not limited to that sent <u>and</u> received via e-mail, chat, texts, blogs, telephone, and via websites, and including communications such as voicemails. Data shall include but are not limited to contracts with agents or third parties, contracts with customers, call records, marketing records, client communications and records, and accounting records, and all complaints, ("Discoverable Data"). Discoverable Data shall include security records as well as past, present, and future audio and/or video surveillance of those areas where Discoverable Data is kept and where access may be gained. Any changes in security policies or practices that would degrade the security of anything that may constitute Discoverable Data will be met with extreme scrutiny and would likely result is severe consequences.**

Electronic documents and the storage media on which they reside contain relevant

discoverable information beyond what may be bound in printed documents, e.g., author, creation dates, and other metadata. Therefore, even where a paper copy exists, the electronic versions are still subject to this notice of litigation hold.  Moreover, paper documents may contain unique information created after they were printed (e.g., handwriting, signatures, marginalia, drawings, annotations, or highlighting, etc.), and so even while electronic versions of these documents exist, these paper versions are relevant and subject to this notice of litigation hold.

Careful attention should be paid to the proper continued security and preservation of that involving any associated "prior express written consent" that may be claimed in any defense to the claims herein, with preservation of evidence to include: (i) authentication, i.e., the means of authenticating the identity of the person allegedly signing; (ii) security, i.e., the binding of the alleged signature to the alleged document and proof of non-alterability after the alleged signature has been fixed thereto; and (iii) record retention, i.e., that involving secure storage and those who have access, and the records and communications created as a result of any prior express written consent.

Although a motion may be brought for an order preserving documents and other data from destruction, your obligation to preserve documents and other data arises independently from any filing of a compliant, motion, or court order. In other words, the filing of a complaint or service thereof is not a prerequisite to compliance with a litigation hold obligation. Specifically, the duty to preserve evidence arises when that party knew or reasonably would have known that such evidence might be relevant to a possible action, and most certainly, as is the case here, at the time a party is on notice. *See, e.g., Linnen v. A.H. Robins Co., Inc.*, 10 Mass. L. Rptr. 189, 1999 WL 462015 (Mass. Super. Ct. 1999) (Brassard, J.); *Townsend v. American Insulated Panel Co., Inc.*, 174 F.R.D. 1, 3, 37 Fed. R. Serv. 3d 1166 (D. Mass. 1997)

Motor Trend Group must take every reasonable step to preserve the materials subject to this notice of litigation hold until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup media recycling policies. With regard to data created subsequent to the date of this letter, relevant evidence should not be destroyed and you are to take the appropriate steps required to avoid destruction of such evidence. It would be wise to seek legal advice to ensure your compliance with this notice of litigation hold.

## WARNING NOTICE

Should it be discovered that Motor Trend Group failed to comply with the above notice of litigation hold, such would have severe consequences. With respect to court proceedings against Motor Trend Group, the court may award sanctions up to default judgment. See *Fletcher v. Dorchester Mut. Ins. Co.*, 437 Mass. 544, 551, 773 N.E.2d 420, 426 (2002) (saying that "if spoliation occurs in violation of a discovery order, various sanctions, including dismissal or judgment by default, may be imposed for that violation."); *Keene v. Brigham and Women's Hosp., Inc.*, 439 Mass. 223, 234-37, 786 N.E.2d 824, 833-35 (2003) (saying that in "the spoliation context (like in the discovery

context), a judge has broad discretion to impose a variety of sanctions against the defendant for the breach of its statutory duty to retain the plaintiff's missing records ... default judgment is committed to the sound discretion of the judge, with such sanction of default judgment being available upon a finding of willfulness or bad faith.)

Should Motor Trend Group fail to respond within five days to the TCPA and MTSA demands, an action will be brought seeking the above-mentioned statutory damages.

Should Motor Trend Group fail to respond within 30 days to this G.L. c. 93A demand, a an action will be brought (or amended) against Motor Trend Group and officers in their individual personal capacities seeking, *inter alia*, treble actual damages as to each officer. In addition, court costs, and attorney fees will be sought as applicable.

Be advised, under G.L. c. 93A, corporate officers may be held personally liable without needing to pierce the corporate vale. See *Nader v. Citron*, 372 Mass. 96, 360 N.E.2d 870 (1977) (abrogated on other grounds by, *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008)).

Specifically, "corporate officers can be held personally liable for participating in unfair and deceptive business practices." *Bolen v. Paragon Plastics*, Inc., 754 F. Supp. 221, 228 (D. Mass. 1990), citing *Nader v. Citron*, 372 Mass. 96, 103, 360 N.E.2d 870, 875 (1977) (abrogated on other grounds by, *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008)) and *Manning v. Zuckerman*, 388 Mass. 8, 10, 444 N.E.2d 1262, 1263 (1983); See also, *Hoch v. Porrazzo*, 2005 Mass. App. Div. 61, 62, 2005 WL 1383340 (2005) and cases cited; *Shaw v. Yellin*, 2008 Mass. App. Div. 141, 2008 WL 2627637 (2008), decision aff'd, 75 Mass. App. Ct. 1103, 912 N.E.2d 1040 (2009) (personal liability of corporation's shareholders and officers for unfair and deceptive acts under G.L. c. 93A); *Musi v. Blair*, 2011 Mass. App. Div. 51, 2011 WL 704745 (2011) (liability under G.L. c. 93A for one who acted on behalf of company and played a key role in its operation); *Adelphia Agios Demetrios, LLC v. Arista Development*, LLC, 2013 WL 1622675 (D. Mass. 2013) (case involves G.L. c. 93A claims against officer of an LLC); *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129 (D. Mass. 1998); See also *Shaw v. Yellin*, 2008 Mass. App. Div. 141, 2008 WL 2627637 (2008), decision aff'd, 75 Mass. App. Ct. 1103, 912 N.E.2d 1040 (2009)

Accordingly, as Motor Trend Group principle officers may be liable for claims under G.L. c. 93A, as well as under the TCPA and MTSA, whereby claims against the principle officers may be brought, these officers are also subject to personal jurisdiction in Massachusetts under the explicit statutory provisions of the MTSA, as well as the provisions of the Massachusetts Long Arm Statute, G.L. c. 223A. Accordingly, if Motor Trend Group fails to respond favorably and it becomes necessary to file an action, a complaint will be filed naming Motor Trend Group officers in their personal capacities.

Please <u>do not</u> sent paper correspondence to either of my Martha's Vineyard Residences. Please direct paper correspondences, if any, to my all-season mailing address at 103 Prospect Street, Wakefield MA 01880, unless otherwise noticed.

Very Truly Yours,

Robert A. Doane

Exhibit 3

# Exhibit 3

**ROBERT A. DOANE**
Martha's Vineyard Residence
Twenty-One New Lane and Seventy Blackthorn Road
West Tisbury, MA 02575

——

robertdoane@rcn.com

Mailing Address

103 Prospect Street
Wakefield, MA 01880

Tel: 781-245-6577
Facsimile 888.712.2724

17 June 2019

## NOTICE OF INTENT TO SUE

*Sent Via US Mail*
Members and Managers
Motor Trend Group, LLC
831 S. Douglas Street
El Segundo, CA 90245

    RE:    Doane v. Motor Trend Group, LLC

Dear Members and Managers:

    As you are aware, and according to registered mail tracking, on May 16, 2019, Motor Trend Group, LLC, and each of its members and managers, including the entity "TEN: The Enthusiast Network, Inc.," as well as persons as members and managers in their individual and personal capacities (collectively "Motor Trend Group"), received a demand letter dated May 13, 2019 ("Demand Letter"), after Motor Trend Group was determined responsible for, among other things, causing text messages to be sent, likely to thousands of cellphones throughout Massachusetts, which included mine, without regard to those listed on state and federal do-not-call registries, and without prior consent, in violation of the Telephone Consumer Protection Act 47 U.S.C. §227, et seq. ("TCPA"), and the Massachusetts Telephone Solicitation Act, G.L. c 159C, et seq. ("MTSA"), and in per se violation of the Massachusetts Consumer Protection Act, G.L. c. 93A. The Demand Letter sought a response to the TCPA and MTSA claims within five days, and a response to the G.L. c. 93A demand within 30 days. To date, no response has been received. The time within which to respond has elapsed.

    Accordingly, this letter puts MotorTrend on notice of my intent to sue. It is my intention to file a complaint without further delay, seeking all available damages and remedies, including court costs and attorney fees. Moreover, since MotorTrend failed to timely respond to the Demand Letter, it is my intent to seek punitive damages under G.L. c. 93A, equal to not less than two and up to three times actual damages as to each named defendant without the right of contribution.

    If MotorTrend reconsiders and desires to avoid the cost and expense of litigation, preferring to discuss a possible compromise resolution, please contact me immediately at robertdoane@rcn.com with your position.

Please <u>do not</u> sent paper correspondence to either of my Martha's Vineyard Residences. Please direct paper correspondences, if any, to my all-season mailing address at 103 Prospect Street, Wakefield MA 01880, unless otherwise noticed.

Very Truly Yours,

Robert A. Doane

Exhibit 4

# Exhibit 4



AT&T WI-FI  5:06 PM  17%

Touch to return to call. 03:12

 26



467-58 >

Lending Cloud 365: Auto insurance as low as $29/mo! Click here http://search-autoinsurance.info and enter your Zip Code to Start! Txt STOP to OptOut

Mon, May 13, 9:30 AM

Lending Cloud 365: Get a 2015 Chevy Malibu for Zero Down and $119/mo! Others to choose from too! Bad Credit ok! http://used-autos-here.info Txt STOP to OptOut

Fri, May 31, 9:33 AM

Lending Cloud 365: Get a 2015 Chevy Malibu for Zero Down and $119/mo! Others to choose from too! Bad Credit ok! http://autos-searched-here.info Txt

Text Message

AT&T Wi-Fi 🛜                    5:06 PM                    17%

‹ 26                   467-58 ›

Chevy Malibu for Zero Down and $119/mo! Others to choose from too! Bad Credit ok! http://autos-searched-here.info Txt STOP to OptOut

Wed, Jun 12, 9:33 AM

Lending Cloud 365: Get a 2016 Honda Civic for $0 Down and $119/mo! Choose other options too! http://get-used-cars-now.live/127409981 Txt STOP to OptOut

Thu, Jun 27, 6:42 PM

Lending Cloud 365: Get a 2017 Ford Fusion for $0 Down and $129/mo! Choose other options too! http://get-free-car-quotes-today.info/127409981 Txt STOP to OptOut

    Text Message   

      

 AT&T WI-FI 📶 5:06 PM ✈ 17% 🔋

‹ 26



**467-58** ›

**Text Message**
**Thu, Apr 18,** 10:12 AM

Lending Cloud 365: Auto
Insurance as low as $29/mo!
Click here http://my-auto-
insurance.info and enter your
Zip Code to Start! Txt STOP to
OptOut

**Mon, Apr 22,** 9:19 AM

Lending Cloud 365: Used Car
Deals! Zero Down and $129/
mo! Malibu's, Impala's,
Corolla's & more! Bad Credit
ok! http://find-usedcars.info
Txt STOP to OptOut

**Thu, May 2,** 9:27 AM

Lending Cloud 365: Auto
Insurance as low as $29/mo!
Click here http://search-

  Text Message 

      



GET A NO OBLIGATION, FAST & SIMPLE
## FREE QUOTE ON THE BEST USED DEALS

Please select the body type & price range of the car you are interested in.

| | |
|---|---|
| **Body Type** | Select Body Type |
| **Price Range** | Select Price Range |
| **Zip** | 01880 |

## GET BEST DEALS

🔒 100% Secure, Private & Confidential

## HOW IT WORKS:

1. Pick the body style and price range you want
2. We find the 30 best deals in your area
3. You get discount Internet pricing!

⭐ See which dealers offer discounts

⭐ Instantly compare the best deals

⭐ It's fast & free!

Detroit Trading and 1800CARSHOW offer this service to help you shop for a cars online. We will share the information you provide with the dealers that you select. They and/or an 1800CARSHOW agent will contact you to go over pricing and incentives for your vehicle selection(s). By using these services, you accept the terms outlined in our Terms of Use and Privacy Policy. Unsubscribe



Exhibit 5

# Exhibit 5

From: **Diana Malhis** Diana_Malhis@motortrend.com
Subject: Response to Cease & Desist; Demand FTCPA
Date: July 9, 2019 at 5:14 PM
To: robertdoane@rcn.com
Cc: Diana Malhis Diana_Malhis@motortrend.com



Mr. Doane,

Sincere apologies for a delayed response. Your correspondences recently came across my desk. I have been conducting an internal investigation as to the nature of your concerns and complaints. I do want you to know that MT has not and does not engage in any of these practices and is not the party responsible for your grievances. Indeed, MT does not even send text messages or make telephone calls to any of its consumers. However, I have been able to identify the appropriate and responsible company, so that you may resolve this to your satisfaction as soon as possible.

Please refer to legal@xanadumarketing.com.

Xanadu Marketing has indicated to an intermediary that it is willing to take responsibility and engage with you to address these complaints towards resolution. Again, MT has no involvement with Xanadu Marketing nor any practices that violate TCPA and/or the MTSA. I hope this will be helpful to you. Thank you.

**DIANA R. MALHIS**
**VICE PRESIDENT, HEAD OF LEGAL**
t: +1-310-531-9953 · m: +1-310-341-8866
HQ: 831 South Douglas Street, El Segundo, CA 90245
motortrendgroup.com | motortrend.com

Exhibit 6

# Exhibit 6



**Joe Delfgauw** • 3rd+

Managing Member/Owner at The H.O.M.E. Program

1w

Looking for Leads? Our Feed has over 2 Million Leads. The types of leads are basically the Sub Prime Credit Vertical. We sell the leads for only .006 per records and it includes name, emai, phone, ip, date stamp and source url. Leads are TCPA compliant and are good for:

-Call Centers
-SMS Marketers
-Email Marketers
-Lead Brokers
-Rev Share Partners
-many other verticals

The categories and verticals are in

-Rent to Own
-Credit Repair
-Mortage/Homeowners
-Jobs
-Auto Insurance
-Sweepstakes
-Education
-Biz Opps

Message me here if you want to talk

3

Reactions

---

Joe Delfgauw

Managing Member/Owner at The H.O.M.E. Program

**View full profile**

Exhibit 7

# Exhibit 7



Xanadu Marketing | MyMediAds

https://mymediads.com/companies/2058

MEDI·ADS

Marketing Ads    Job Ads    Companies

Search for marketing/job ads, companies, people...

Sign In    Join    POST NEW AD

About    FAQ

Want to stand out in the crowd?
Grab all the business opportunities
Reach the right audience with us

Highlight your ads
Highlight your company page

TRY UPGRADES

**Xanadu Marketing**
http://xanadumarketing.com/
Marketing and Advertising

XANADU MARKETING

Share your company page
with potential partners

Impressively, Xanadu Marketing happens to be one of the only agencies not only offering, but providing a place for all of your offers. We own the 411 Network, an affiliate marketing network designed to house multiple advertisers and affiliates in one seamless space for easy payouts. Xanadu Marketing has collaborated with dozens of publishers in the verticals of real estate, business, finance, credit, legal, e-commerce, and many others given our prolific involvement in the advertising space. Our rich ability to develop landing pages, banners, and creatives. As if that wasn't enough... Xanadu Marketing does more than just affiliate networking and advertising. We're even in the space of lead buying and selling. Big data. It's been the biggest trend since native advertising, and email marketing is a massive portion of what we specialize in.

We have professional partnerships with all sorts of brands in the call center vertical, allowing us to harness your leads for conversions and generate as much revenue as possible for you and your business. Live transfers, warm transfers, pay-per-call, it doesn't matter: we can handle all of it, and if you're interested in buying leads, we can do that, too.

REGISTERED EMPLOYEES

Cookies help us deliver our services. By using our services, you agree to our use of cookies.    OK

Exhibit 8

# Exhibit 8



Contact

www.linkedin.com/in/angiecole84

Top Skills
Microsoft Office
Microsoft Excel
Microsoft Word

Languages
English

# Angie Cole

Director at Xanadu Marketing
Greater Grand Rapids, Michigan Area

## Summary

I'm an Operations Manager/Director with an interest in building and maintaining the most efficient workplace possible. For over 8 years, I've been implementing new business plans with the best practices and executing them on a daily basis.

When I'm not on the job, I love playing games with my son, aerial silks, playing with my dogs, cooking, and satisfying my appetite for eclectic foods.

If you'd like to learn more about me, please reach out via email at Angie.Cole84@gmail.com

———

## Experience

**Xanadu Marketing**
Director
August 2016 - Present
Greater Grand Rapids, Michigan Area

• Manage the interaction with workflow, outside call centers and our proprietary CRM
• Analyze quality of leads and outside call centers to focus on improving quality and revenue
• Provide overall management support of the company operations

**BAM's Notary Service, LLC**
Co-Owner
September 2011 - Present

• Created a national network of almost 2,000 signing agents to assist with various types of closings (debt settlement, mortgage loans and refinances, power of attorneys, etc.)
• Manage all daily operations to maintain customer and signing agent satisfaction
• Maintain accuracy of records for signing agents and customers



• Perform all payroll duties

## LINCUP
**Hospitality Coordinator**
March 2016 - December 2016 (10 months)
1167 Madison Ave SE, Grand Rapids, MI

• Coordinate all private events within LINCUP's venue and coordinate all catering needs
• Maintain accuracy of records for Income & Expenses in QuickBooks and make sure all receipts are recorded weekly • Increased booking for venue rentals and catering by handling all incoming calls promptly and efficiently
• Keep restaurant manager on task by scheduling all calendar events and monitoring them at all times
• Created all excel spreadsheets and PDF documents with formulas for efficiency
• Assist other departments, as needed, with various tasks

## Complete Debt Settlement, LLC
**Operations Manager**
January 2010 - February 2016 (6 years 2 months)
Greater Grand Rapids, Michigan Area

• Created, successfully implemented, and executed several business plans from start to finish
• Analyze all daily, weekly and monthly sales and customer service statistics • Uphold all affiliate business relationships • Process all incoming and outgoing revenue and expenditures • Process all incoming mail, email and faxes • Administer all employee meetings, payroll, and paperwork including new hire documents, time off requests, compensation agreements, disciplinary forms, etc. • Conduct all marketing and all marketing research
• Supervise the entire organization to remain compliant and profitable
• Manage all daily operations for marketing, sales and customer service
• Responsible for all Technology needs including phone systems, computers, connectivity, websites and CRM functionality

## First American Title
**Escrow Assistant**
November 2007 - December 2009 (2 years 2 months)

• Managed fast pace environments
• Courteously assisted borrowers, notaries and lenders to ensure customer satisfaction and successful loan closings • Processed, prepared and reviewed



escrow and lender documents in accordance with established policies and procedures
• Prepared and revised HUD's by utilizing lender instructions
• Ran reports to ensure timely and accurate closings
• Assisted in addressing and resolving any complaints or concerns from borrowers, notaries and/or the lender

———

## Education

East Kentwood High School
Diploma, General Studies · (1998 - 2002)

Exhibit 9

# Exhibit 9

# Better Business Bureau®

Home > Michigan > Grand Rapids > Loans > Lending Cloud 365 > Complaints

« Complaints

# Complaints



# Lending Cloud 365

📍 14200 Ironwood Dr. NW
Grand Rapids, MI
49534

🌐 https://www.lendingclo
ud365.com/contact-us/

📞 (800) 452-2406

---

**Complaint Type:** Problems with Product/Service     **Status:** BBB unable to locate business

07/11/2019

They keep texting my phone without my concentration. I'm on the do not call list and nor did i contact them for anything. Please stop harassing me I'm on the do not call list and didn't ask for services from your company ever.

**Desired Outcome**
Stop texting my phone.

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

06/23/2019

I had signed on to look at rent to own homes, they keep sending msgs. And calling me. I texted back when prompted to text STOP to opt out and didn't work. Nor do they have an unsubscribe button. It's becoming harassing and also aggravating filling up my inbox and voicemail. Please get them to stop.Ot email me directions to handle it myself. Thank You ***************** *****************************

**Desired Outcome**
Modification/discontinuance of To be unsubscribed from all of their affiliates, including them.

> **Lending Cloud 365 Response**          07/02/2019
>
> The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Resolved

06/02/2019

Continues texts to my phone. I have no idea who this is and how they got my phone number Continues texts to my phone on things I have no interest in, nor did I request information on.

**Desired Outcome**

Remove me from all further texts and stop them from obtaining phone numbers to randomly send text information to.

**Lending Cloud 365 Response**                                    06/18/2019

The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused

**Customer Response**                                            06/19/2019

(The consumer indicated he/she ACCEPTED the response from the business.) Glad to be off this mailing list. However, if BBB looks at other similar complaints regarding this business, this is something they do (and later apologize for) on a regular bases. Seems to me, the business is going to continue this practice of harassing individuals, and only those who take the time to pursue resolution will actually find satisfaction. Seems to me the BBB should go after this businesses practice once and for all. This business is robo texting and I believe that is against the law!

**Complaint Type:** Problems with Product/Service     **Status:** Resolved

05/29/2019

They text me every day and when I text back STOP, it won't go through. PLEASE have them take my number off their list. I receive text messages every day from these people, when I text back STOP as instructed, it won't go through. HAVE THEM TAKE MY NUMBER OFF THEIR LIST PLEASE!!!!!

**Desired Outcome**

I need them to stop texting me.

**Lending Cloud 365 Response**                                    06/10/2019

The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused

**Customer Response**                                            06/13/2019

(The consumer indicated he/she ACCEPTED the response from the business.)

**Complaint Type:** Advertising/Sales Issues     **Status:** Resolved

05/19/2019

Stop sending me text, I keep blocking your numbers and you keep sending me stuff!!!!!!!! Stop, please stop

**Desired Outcome**
Stop contacting me

**Lending Cloud 365 Response**                                    06/03/2019

The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused.

**Customer Response**                                             06/04/2019

(The consumer indicated he/she ACCEPTED the response from the business.)

**Complaint Type:** Problems with Product/Service     **Status:** Resolved

05/14/2019

I've texted to opt out but still getting texts. Didn't sign up for this so they got my number w/o my consent. Never heard of them until texts. I've texted to opt out but still getting texts. Didn't sign up for this so they got my number w/o my consent. Never heard of them until texts.

**Desired Outcome**
Stop text messages and any other forms of communicating with me.

**Lending Cloud 365 Response**                                    06/03/2019

The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused.

**Customer Response**                                             06/04/2019

(The consumer indicated he/she ACCEPTED the response from the business.) .

**Complaint Type:** Advertising/Sales Issues     **Status:** Resolved

05/17/2019

Receiving spam text messages even though I never gave them my phone number. I randomly began receiving text messages about used cars even though I never to my knowledge have given any information to any car dealership. I don't know how they got my number but I get a text at least once per day.

**Desired Outcome**
I do not want them to have my information anymore and to stop contacting me.

**Lending Cloud 365 Response**                                    06/03/2019

The individual's information has been removed from the company database. The company apologizes for any inconvenience this may have caused

**Customer Response**                                06/04/2019

(The consumer indicated he/she ACCEPTED the response from the business.) I
have not received any texts since.

---

**Complaint Type:** Advertising/Sales Issues    **Status:** Answered

04/29/2019

They constantly send me text and when I try to stop they say cannot be sent I am text
every 15 minutes I want them to take me off their list They keep sending texts that I
want them to stop

**Desired Outcome**
Have them quit contacting me

**Lending Cloud 365 Response**                        05/06/2019

The individual's information has been removed from the company database.
The company apologizes for any inconvenience this may have caused

---

**Complaint Type:** Advertising/Sales Issues    **Status:** Answered

04/24/2019

Receiving text messages and being charged for a service I NEVER requested. I need
them/Lending Cloud to remove my information from their company data. I don't have
any business with Lending Cloud 365. I need them/Lending Cloud 365 to remove my
information from their company data.

**Desired Outcome**
I need them/Lending Cloud 365 to remove my information from their company data.

**Lending Cloud 365 Response**                        04/30/2019

The company will remove ******************'s information from their data base

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

04/05/2019

Repeated texts offering homes for sale and rent - OPT out as instructed and still continue to get texts. Opt out does NOT work.

**Desired Outcome**
No more contact

**Lending Cloud 365 Response**                     04/23/2019

The company apologizes for any inconvenience this may have cause.
Individual's information will be removed form company data base

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

03/29/2019

They keep harassing me and wont stop texting with offers ...

**Desired Outcome**

...

**Lending Cloud 365 Response**                     04/10/2019

The company apologizes for any inconvenience this may have caused.
Complainant's information will be removed from the company data base.

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

03/29/2019

Non-stop Text Messages - Tried to Opt-Out but still they persist I have been receiving text messages from Lending Cloud (Phone number is ******). I have replied "STOP" as they instructed to Opt Out. I receive a confirmation stating that I will not receive any more messages. But within a few hours, they start again.

**Desired Outcome**
No further text messages or contact from the business

**Lending Cloud 365 Response**                     04/10/2019

The company apologizes for any inconvenience this may have caused.
Complainant's information will be removed from the company data base.

---

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

03/18/2019

Repeated texts every 15 minutes Not sure how the company received my cellphone number

**Desired Outcome**
No more phone calls

**Lending Cloud 365 Response**                                            04/01/2019

The company apologizes and attempted to remove the person from its records based on the contact information listed in this complaint, but found no record for a R Carter at that email address

**Complaint Type:** Advertising/Sales Issues      **Status:** Resolved

04/04/2019

Spam texts every day. continuing even after replying 'stop' This company sends texts from ******* to my cell phone with the option to reply 'stop' to opt out. I reply stop every time and continue to receive the texts anyway.

**Desired Outcome**
I want them to stop texting me.

**Lending Cloud 365 Response**                                            04/10/2019

The company apologizes for any inconvenience this may have caused. Complainant's information will be removed from the company data base.

**Customer Response**                                                     04/11/2019

(The consumer indicated he/she ACCEPTED the response from the business.)

**Complaint Type:** Advertising/Sales Issues      **Status:** Answered

10/24/2018

Receiving unsolicited text messages to cell phone (SPAM) Lending Cloud 365 regularly sends me texts from *****, ******, and *****. These run along the lines of offers for renting, boat/car loans and mortgage offers. I have never contacted them in the first place and texting STOP does not stop the texts from coming AT ALL HOURS OF THE DAY!!! Worse yet, I have a prepaid phone and am PAYING to receive this spam!

**Desired Outcome**
Please remove ALL of my contact information from Lending Clouds records. I also would like reimbursement for all the texts I had to pay for that came from you. If I charged .25/text you owe me at least $20 (and that's for the texts I did not delete) but I won't hold my breath on that request.

**Lending Cloud 365 Response**                                            11/08/2018

The company apologizes for any inconvenience this may has caused and will remove Ms. ****** information from our system. It should be noted that Ms. **** made the initial contact with the company.

**Customer Response**                                              01/25/2019

Please reopen this case. I've started receiving text messages from Lending Cloud again - same kind and format as before. Even though they claim I did, I did NOT request to receive notifications from them EVER! Especially not since this case was closed. 7:05pm CST 1/22/19 received "Lending Coud 365: New Foreclosed Home Listings under $58,000! Zero Down and under $415/mo. Find here ****://**********.*****.**** Txt STOP to OptOut" Please have Lending Cloud remove all my personal contact information - permanently!

**Lending Cloud 365 Response**                                    02/06/2019

I confirmed that Ms. **** was removed from the system on November 8th.

**Customer Response**                                              02/07/2019

(The consumer indicated he/she DID NOT accept the response from the business.) In November this business claims my info was removed from their system. In January I received text messages from them again. Their explanation of "I confirmed xxx was removed in November" does not explain why I still get text message from them or someone doing a really good impression of them.

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

01/07/2019

Lending Cloud 365: Illegally using SMS messaging to cell phones to troll for customers Started receiving SMS text messages from ***** on one of our cell phones. The messages are from Lending Cloud 365, offering "used cars for 0 down" for people with bad credit. We have no prior relationship with this company, are not looking for "used cars", and do not have bad credit. The texts are a clear violation of the Federal Telephone Consumer Protection Act, and applicable state consumer fraud laws. Tried to text "STOP" to opt out of further messages, but system indicates that there would be a charge for this. Again... completely illegal. This is obviously a fraudulent entity that is intentionally and blatantly operating in an illegal manner. A SCAM ~!

**Desired Outcome**
We expect no further text messages or telephone calls from this company or any of their "affiliates". All text messages and voicemails have been preserved as evidence, and will be submitted to the US Attorney's office if even one more call / text is received.

**Complaint Type:** Problems with Product/Service     **Status:** Resolved

12/21/2018

Constantly receiving text from this company about a loan I never requested. Constantly receiving text from this company about a loan I never requested. I wish that they would STOP sending me communications regarding this loan!

**Desired Outcome**
STOP texting my phone number

Lending Cloud 365 | Complaints | Better Business Bureau® Profile          https://www.bbb.org/us/mi/grand-rapids/profile/loans/lending-clou...

**Complaint Type:** Advertising/Sales Issues     **Status:** Resolved

12/27/2018

I am receiving unsolicited text messages from this company. I continue to received unsolicited text messages advertising loan services from this company.

**Desired Outcome**
I want them to stop texting me and lose my phone number!

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

10/21/2018

Unwanted text messages and advertisement. I would like to be removed from this company's system for any type of advertisement our marketing. I never gave this company permission to send text messages to my cellular phone nor would I like to receive any type of advertisement and my personal email if this company does have my email on file as well.

**Desired Outcome**
The best resolution is for me to be removed from this company database for any type of advertisement or marketing purposes.

**Complaint Type:** Advertising/Sales Issues     **Status:** Answered

10/29/2018

Constant spam txt messages and does not comply with Opt Out "STOP" responses. This company Lending Cloud 365 has been harassing me for months now with multiple messages per day on most days. I am SICK and TIRED of this company sending messages to my phone. They refuse to honor the OPT OUT "STOP" reply no matter how many times it is sent back to them. I NEVER registered anything with this company and had never heard of them before mass spam.

**Desired Outcome**
Apparently I am not alone in the frustration of undesired contact by Lending Cloud 365. I seek to have this company delete any and all information regarding me and my contact information. Never contact me again.

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. BBB asks third parties who publish complaints, reviews and/or responses on this website to affirm that the information provided is accurate. However, BBB does not verify the accuracy of information provided by third parties, and does not guarantee the accuracy of any information in Business Profiles.

When considering complaint information, please take into account the company's size and volume of transactions, and understand that the nature of complaints and a firm's responses to them are often more important than the number of complaints.

8/11/19, 3:50 PM

Lending Cloud 365 | Complaints | Better Business Bureau® Profile          https://www.bbb.org/us/mi/grand-rapids/profile/loans/lending-clou...

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to change at any time. If you choose to do business with this business, please let the business know that you contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

© 2019, International Association of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US, Canada and Mexico and BBB Institute for Marketplace Trust, Inc. All rights reserved.